STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MARKO BEY (I), DEFENDANT–APPELLANT.

Argued September 15, 1987—Decided August 2, 1988.

48

*James K. Smith, Jr.,* Deputy Public Defender, and *Judith L. Borman,* Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney; *James K. Smith, Jr., Judith L. Borman* and *Robert A. Seelenfreund,* Assistant Deputy Public Defender, on the briefs).

*Alton D. Kenny,* Assistant Prosecutor, argued the cause for respondent (*John A. Kaye,* Monmouth County Prosecutor, attorney; *Alton D. Kenney, James W. Kennedy* and *Mark P. Stalford,* Assistant Prosecutors, of counsel; *Joseph W. Oxley* and *Peter J. Boser,* Assistant Prosecutors, on the briefs).

*Boris Moczula,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Dorothy G. Turi,* Former Deputy Attorney General, and *Jeffrey L. Menkin,* Deputy Attorney General, of counsel and on the brief).

*Herbert I. Waldman* submitted a brief on behalf of *amicus curiae* American Civil Liberties Union (*Podvey, Sachs & Catenacci,* attorneys; *Herbert I. Waldman, H. Richard Chattman*

*and* Deborah Karpatkin, *of counsel;* Herbert I. Waldman *and* H. Richard Chattman, *on the brief).*

The opinion of the Court was delivered by

STEIN, J.

This case, and *State v. Bey,* 112 *N.J.* 123 (1988) (*Bey II*), also decided today, are both pre–*Ramseur/Biegenwald* capital prosecutions. We address certain trial errors in this case and hold that defendant must be retried. Additionally, since the Legislature has amended the capital punishment statute to preclude imposing the death sentence on juveniles, we conclude that capital resentencing is barred in this case. In *Bey II* defendant's convictions are affirmed, but principles established in *Ramseur* [*State v. Ramseur,* 106 *N.J.* 123] and *Biegenwald* [*State v. Biegenwald,* 106 *N.J.* 13] require a new sentencing proceeding.

Defendant Marko Bey was convicted of murder, felony murder, aggravated assault, and aggravated sexual assault, and sentenced to death by a Monmouth County jury. Defendant's appeal as of right to this Court, *R.* 2:2–1(a)(3), challenges on both constitutional and statutory grounds the application of the death penalty statute due to his status as a minor at the time of the offense. Defendant also contests his four convictions, asserting primarily that the introduction of his confession at trial violated his fifth amendment rights, and that his state and federal constitutional rights to a fair and impartial jury were violated by the jury's potential exposure to prejudicial mid-trial publicity. We reverse defendant's convictions on both these grounds. We also conclude that the Legislature did not intend for the Code's death penalty provisions to apply to defendants who were juveniles when the crime was committed; the Attorney General agrees, although for different reasons, that defendant on retrial cannot be exposed to the death penalty. If retried and again convicted of murder, defendant can be sentenced to a term ranging from thirty years to life imprisonment

with a mandatory minimum term of thirty years. *N.J.S.A.* 2C:11–3b.

## I

Early in the morning of April 2, 1983, Patrolman Kenneth Whritenour of the Neptune Police Department responded to a radio call directing him to a vacant lot adjacent to the board-walk in Ocean Grove. Whritenour discovered the nude and battered body of a young, black female subsequently identified as Cheryl Alston. A bra was knotted loosely around the victim's neck.

Investigators from the Monmouth County Prosecutor's Office called to the scene found the victim's clothes balled up in the doorway of one of four nearby, abandoned bathhouses, along with various cosmetic items strewn about. A single trail of footprints ran from the bathhouse to the victim's body, and from the body towards Spray Avenue. A dented "two-by-four" piece of wood with blood on the end was recovered as well.

Alston had last been seen the night before when she and her mother returned to their Asbury Park home at approximately 12:45 a.m., after visiting local friends. Alston's mother had gone inside while the victim remained outside, sitting in front of the house on a concrete embankment. Shortly thereafter she disappeared.

Slightly more than a month later, on May 6, 1983, at approximately 5:15 p.m., officers from the Asbury Park and Neptune Police Departments arrested the defendant at his mother's home in Neptune for suspected involvement in another incident, the murder of Carol Peniston.[1] He was briefly held in the house while the police executed a search warrant, and then

---

[1]The record does not make clear whether Bey was also suspected of the Alston murder at the time of his arrest; at oral argument the State acknowl-edged that he was "look[ed] at for the Alston murder * * * as an afterthought * * *."

transported to the Asbury Park Police Department where he was turned over to Detective John Musiello and Investigator Phillip George of the Monmouth County Prosecutor's Office. Defendant was read his *Miranda* rights by Musiello, and signed a "Miranda card" acknowledging that he had been so advised.

The police began questioning Bey about the Peniston matter at 5:38 p.m., and after breaks for dinner, use of the bathroom, and an hour of rest in his cell, he confessed and gave a written statement commencing at 10:55 p.m. and concluding shortly before midnight. After a second break for food, Detectives Edward Green and Robert Adams of the Neptune Police Department joined Musiello and George. Defendant was read-vised of his *Miranda* rights and signed another "Miranda card" at 12:07 a.m. According to Green and George, defendant indicated that he understood his rights. He was informed that the officers now wished to question him about the murder of Cheryl Alston. At the pretrial *Miranda* hearing, and at trial, Investigator George testified that the defendant initially "indi-cated he did not want to talk to us about it [Alston]," and said "he didn't know anything about it." George continued to discuss the matter with defendant, and sometime after the other detectives left the room, Bey conceded he had known the victim and had seen her the night of her death. By 1:00 a.m. defendant had orally confessed to the Alston murder. After he and George were rejoined by Detectives Adams and Green, defendant gave and signed a written statement, commencing at approximately 1:15 a.m. and concluding at 2:48 a.m. Prior to taking this statement the police again read defendant his rights, and defendant signed the cover page of the statement acknowledging that he understood his rights and that he wished to waive them and give a voluntary statement.

The confession, read into the record in its entirety at trial, disclosed that defendant had met Alston three years earlier. They met again by chance, near the beach, on the night in question. Bey said he had already smoked six or seven mari-

juana cigarettes that night, and had drunk at least one forty-ounce bottle of beer. After smoking another "joint" with Alston, the two agreed to have sex and walked over to the nearby row of bathhouses. The statement reads in part:

We went inside of one (1) and we both took our clothes off. She layed her jacket down and laid on top of it. Then I got my nut and I wanted to start again and she didn't. She [sic] we just started kissing again and I started again and she wanted to stop and she started hitting me. Then I got dressed and I had got down to the sand and I dropped her in the sand. I know I beat her but I don't remember how I did it. Then I remember running. I was going home. I ran down the street behind the Palace and then I went home. I ran down Lake Avenue in Asbury Park and I turned down Fisher and I turned on Stratford and then to Drummond Avenue. I stayed home all night.

I woke up the next morning and I heard that someone got killed. I didn't know who it was at that time. I didn't know that it was her until I saw it in the paper.

The statement also reveals Bey claimed to be "high" during the encounter and that his recollection of some details was flawed. He said he had become angry when Alston declined to have sex a second time and began to hit him, and that he did not know "the reason why [he] did it * * *."

A waiver hearing was held, as defendant was seventeen when the crime was committed,[2] and the Juvenile Court waived jurisdiction pursuant to *N.J.S.A.* 2A:4-48 (current version at *N.J.S.A.* 2A:4A-26) and *R.* 5:9-5(b) (current version at *R.* 5:22-2) on May 19, 1983. Bey was indicted for "knowing" or "purposeful" murder (*N.J.S.A.* 2C:11-3a(1), (2)), felony murder (*N.J.S.A.* 2C:11-3a(3)),[3] aggravated assault (*N.J.S.A.* 2C:12-1b(1)), and aggravated sexual assault (*N.J.S.A.* 2C:14-2a(3). The prosecutor served a "Notice of Aggravating Factors" pursuant to section c(2), notifying the defendant that if he were convicted, the State would seek the death penalty and attempt

---

[2]Defendant was born on April 12, 1965, and thus was ten days shy of his eighteenth birthday on April 2, 1983, when Alston was killed.

[3]The murder, felony murder, and death penalty provisions of the Criminal Code are contained in *N.J.S.A.* 2C:11-3. For convenience, "sec." or "section" will be used to refer to this statute (*e.g.,* sec. a(3)).

to prove that "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim," sec. c(4)(c), and that "[t]he offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing * * * sexual assault." Sec. c(4)(g). The defendant entered a plea of not guilty to all counts.

Defendant made several pretrial motions, two of which are pertinent for purposes of this appeal. One sought to bar the "death qualification" of the jury on the ground that application of the death penalty to a defendant who was a minor at the time of the crime would constitute cruel and unusual punishment, proscribed by both the New Jersey and United States Constitutions. The trial court rejected this motion, reasoning that the then-recently-enacted death penalty statute "reflected the [Legislature's] perception of the present state of public opinion, as well as society's current standard of decency." Because the statute did not expressly prohibit imposition of the death sentence for minors, but instead made the defendant's age a factor to be considered in mitigation, the court concluded that the statute's operation in the case of a minor "would be in harmony with society's evolving standard of decency" and hence not cruel and unusual.

Defendant also sought to suppress his confession based on various assertions regarding the conduct of the interrogation. He did not argue, at this point in the proceedings, that he had invoked his right to remain silent when Investigator George first began interrogating him about the Alston case. After a lengthy *Miranda* hearing, at which the testimony of the State's witnesses countered defendant's assertions, the court denied the motion. The court resolved the disputed factual issues adversely to Bey, and ruled that he "was advised of his *Miranda* warnings, that he understood those *Miranda* warnings and that he intelligently waived those rights, and the statement that he gave was [voluntary] with regard to the alleged murder of Cheryl Alston * * *."

The court's ruling on the admissibility of defendant's confession narrowed the range of issues for trial, as the defense was forced to concede Bey's involvement in the crime. The State sought to establish that the victim did not consent to sexual relations with the defendant at any time, and that the defendant committed purposeful and knowing murder in response to her rejection. The defense claimed there had been no sexual assault, and that the defendant's state of mind fell short of "knowingly" or "purposely" because the crime had been committed in the "heat of passion," and because the marijuana and alcohol had reduced his capacity to form such an intent. The court instructed the jury on the lesser offenses of aggravated manslaughter and "heat of passion" manslaughter, *N.J.S.A.* 2C:11-4, and on the defense of intoxication, but a verdict of guilty was returned on all four charged offenses, including murder and felony murder.

During the course of the trial potentially prejudicial news articles were published in the *Asbury Park Press* and *Red Bank Register*, local Monmouth County papers, and gave rise to several defense motions. Before jury selection began defendant moved for sequestration of the jury, once impaneled, in anticipation of unfavorable publicity during the trial. The court denied the motion. Jury selection began on November 29, 1983, and the trial commenced nine days later on December 8. On the afternoon of December 12, near the close of trial testimony, defense counsel produced six articles that had appeared in the local papers since the first day of jury selection. Four of these were articles covering the trial proceedings, each of which mentioned defendant's pending trial for the murder of Carol Peniston, and one of which also mentioned his prior convictions for robbery and aggravated assault. Offering these articles in support, defense counsel moved for a mistrial, or in the alternative for a *voir dire* of the jury to inquire into any potential exposure to the news coverage. The trial court denied both motions, based on its assumption that the jurors had complied with the cautionary instructions regarding publicity issued to

them repeatedly since they had been impaneled. The court was also concerned that the proposed *voir dire* threatened to excite the jurors' curiosity and might prompt them to read the articles. Subsequent sequestration motions later that day, and following the guilty verdict the next day, were also denied.

In the penalty phase, the State sought to prove the two aggravating factors cited before trial, *see supra* at 54–55, and the defense attempted to establish four statutory mitigating factors: "The defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution," sec. c(5)(a); "The age of the defendant at the time of the murder," sec. c(5)(c); "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of * * * intoxication, but not to a degree sufficient to constitute a defense to the prosecution," sec. c(5)(d); "Any other factor which is relevant to the defendant's character or record or to the circumstances of the offense," sec. c(5)(h). At the close of penalty-phase testimony, the court ordered sequestration of the jury "to preclude any direct or indirect communication * * * that might prejudice either the defendant or the State." The Court also denied a second mistrial motion based on prejudicial publicity appearing since the first such motion. The following day the jury returned a verdict finding both aggravating factors and three of the four mitigating factors,[4] and finding further that neither aggravating factor was outweighed by the mitigating factors. Accordingly, the court sentenced defendant to death.[5]

---

[4]The jury rejected the mitigating factor involving reduced capacity due to intoxication. Sec. c(5)(c).

[5]At the time of defendant's trial section c(3)(a) mandated that the court sentence a defendant to death if the jury found one or more aggravating factors and found that it was not outweighed by one or more mitigating factors. Subsequently section c(3)(a) was amended to require that the court sentence the defendant to incarceration unless the jury determines that the

## II

Defendant contended in his pretrial suppression motion that (1) his waiver of *Miranda* rights was neither knowing nor voluntary, (2) the police had violated his right to cut off questioning when they denied his requests to speak with Edward Johnson, a friend of the family left in charge of defendant and his brother while their mother was out of town, and (3) the statements themselves were involuntary. The trial court rejected each of these arguments. The court refused to credit defendant's testimony concerning alleged requests to contact Johnson, and ruled that his waiver of *Miranda* rights was knowing and voluntary and that the confession itself was voluntary as well. On appeal defendant challenges the latter two rulings, and in addition contends the evidence establishes that he invoked his right to remain silent twice during the course of the Peniston and Alston interrogations—once at 8:30 p.m., when he asked to go lie down and think about what happened, and a second time at 12:08 a.m., when he refused to discuss the Alston murder—but that the police failed to "scrupulously honor" such right, as required by *Michigan v. Mosley*, 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.*2d 313 (1975). *See Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966); *State v. Hartley*, 103 *N.J.* 252 (1986).

Defendant's arguments concerning the conduct of the police during the Peniston phase of the interrogation (roughly 5:40 p.m. until midnight) are dealt with in *State v. Bey*, 112 *N.J.* 123, 133–43 (1988) (*Bey II*). The trial court's findings and the record demonstrate that the police complied with the prophylactic dictates of *Miranda*. Defendant twice waived his right to remain silent and to have an attorney present, and defendant's

---

aggravating factor(s) outweigh the mitigating factor(s) beyond a reasonable doubt. *L.*1985, *c.* 178. *See State v. Biegenwald*, 106 *N.J.* 13, 53–67 (1987).

rights under *Michigan v. Mosley, supra,* were not violated. *State v. Bey II, supra,* 112 *N.J.* at 143.

Defendant's claims regarding the Alston phase of the interrogation, however, are another matter. After giving a written statement in the Peniston case, defendant was fed and readvised of his rights. Present were Detectives Musiello, Adams, and Green, and Investigator George. At the *Miranda* hearing, Investigator George described the situation and ensuing events on direct examination:

Q. Who read the [*Miranda*] card to Mr. Bey?

A. I did.

Q. Did Mr. Bey indicate that he understood his constitutional rights?

A. Yes, he did.

Q. Did he sign that card?

A. Yes, he did.

 * * * * * * * *

Q. Did you tell him at that time, what it was that you wanted to advise him about?

A. Yes.

Q. What was that?

A. The murder of Cheryl Alston in Neptune Township.

Q. Mr. Bey indicated he [would talk] to you about that crime?

A. Yes, he did.

Q. Did he indicate at that time any involvement in that offense?

A. Yes, he did.

Q. Initially when you spoke to him, this is 12:07, 12:08?

A. Yes.

Q. You spoke to him at this time, indicated he would speak to you about it. Who was in the room?

A. Initially at 12:08, 12:07, when we advised him of his rights, Detective Green and Detective Adams from Neptune and myself were in the room. *We advised him that we wanted to speak to him about the murder of Cheryl Alston. At that time, he indicated he did not want to talk to us about it at 12:08*

Q. He indicated he didn't know anything about it?

A. That is correct.

Q. What was he doing? Was he just there? Was he eating or doing anything at that time?

A. He was smoking continually throughout our whole conversation. He might have been having a soda and finishing his sandwich. I don't recall.

Q. Was there a time when everybody left the room other than you and Mr. Bey?

A. Yes.

Q. What time was that?

A. About 10 or 12 minutes after our initial advising of the rights.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. Did there come a time when he indicated to you his involvement in the murder of Cheryl Alston?

A. Yes.

Q. When was that?

A. Approximately 12:55 he indicated to me his involvement of the homicide of Cheryl Alston.

Q. Had you been talking to him in the preceding moments, or what brought this about?

A. He indicated he had known Cheryl and talking about his involvement with Cheryl previously, and he told me how he walked up to the boardwalk and saw her there. At that point, we started talking about her death.

Q. Prior to this, he had admitted that he knew Miss Alston and he had seen her that night?

A. Yes.

Also testifying at the *Miranda* hearing were Detective Green and the defendant, who more or less corroborated George's version of the significant events. Green testified he was present when defendant was read his rights and signed the acknowledgment. Continuing, he testified:

Q. Was Mr. Bey at that time questioned about the death of Cheryl Alston?

A. Yes, sir.

Q. *Did he indicate at that time any involvement in that crime?*

A. *No, sir, he did not.*

Q. Did there come a time when you left that office?

A. Yes.

Q. Who remained in the office with Mr. Bey?

A. Investigator George.

### The defendant testified as follows:

Q. Any other conversation with the police about giving the statement?

A. I don't know if you would call it a conversation, but you mean before it was given?

Q. Before it was given.

A. The Prosecutor, Philip George, said we already know the answers to the questions before we ask them. So why don't you come on and tell us what we want to know.

Q. What did you say to that?

A. I didn't say nothing. That is when Green started talking about Mr. Johnson.

 * * * * * * * *

Q. At a time when Green is back.

A. Yes.

Q. Okay.

A. *I wasn't saying nothing. I was just sitting there crying or whatever I was doing. They was asking me questions. I wasn't saying nothing.* I was just saying my phone call, and Green, you know, after I said Mr. Johnson's name, he said that he had talked to him when he was at the house and when he had talked to him on the phone. That I would be able to talk to him after everything was over.

Q. Did you have any conversation before that with Detective George just before you gave the statement?

A. No.

Q. What about Detective Adams?

A. Which one was Detective Adams?

Q. The third one that was present when the statement was taken.

A. Neptune Police? No.

Investigator George confirmed his pretrial narrative of events on direct examination at trial:

Q. Did you initially begin to question Mr. Bey at that time about the death of Cheryl Alston?

A. Yes, I did.

Q. And what, if anything, did he say?

A. *When we initially—myself and Detective Green—asked him if he knew anything about Cheryl Alston's death, he did not want to discuss it.*

Q. Did there come a time when the other officers left the room?

A. Yes.

Q. And who were the officers who left the room?

A. Detective Green and Detective Adams of the Asbury—excuse me—the Neptune Township Police Department.

Q. And approximately what time would you say that it was that he left—they left?

A. We advised him of his rights approximately 12:08 a.m.

About 10 minutes, 15 minutes later, they left.

Q. Okay.

A. Ten minutes, I would say.

Q. During the next portion of time, what was Mr. Bey doing?

A. Mr. Bey and myself are in Captain Wheary's office. He's still eating his sandwich, smoking a cigarette, having something to drink. *And we talked in generalities concerning Miss Alston.*

*And he indicated to me at a later point in time that he was involved in Miss Alston's death.*

Q. What time would you say it is that he ultimately says to you that he's involved in Miss Alston's death?

A. At 12:55, he initially indicated his involvement in the Cheryl Alston homicide.

Defendant reportedly agreed to give a written statement, and George quickly retrieved Green and Adams. Detective Green readvised him of his rights, and defendant executed a written waiver.[6] The police then elicited the written confession subsequently introduced at trial. *See supra* at 53.

█ Defendant's argument concerning these events is basic and straightforward. He asserts that when George began to question him about the Alston incident, he immediately invoked his right to remain silent, a right guaranteed a suspect undergoing custodial interrogation by both the fifth amendment of the United States Constitution and the common law of New Jersey. *See, e.g., Miranda v. Arizona, supra,* 389 *U.S.* at 460–61, 467, 86 *S.Ct.* at 1620–21, 1624, 16 *L.Ed.*2d at 715–16, 719; *Michigan v. Mosley, supra,* 423 *U.S.* at 103, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 321; *State v. Hartley, supra,* 103 *N.J.* at 260, 262–63, 284–86. Further, defendant contends that inasmuch as the police continued to question him rather than terminate the interrogation, his subsequent inculpatory statements were unconstitutionally compelled as a matter of law,

---

[6]The "waiver" consisted of Detective Green re-reading the full *Miranda* warnings, and defendant answering "yes" to the following questions: "Do you understand your rights that I have just read to you?" "Having these rights in mind, do you wish to waive and give up those rights and give a voluntary statement and answer certain questions?" and "Do you understand that this statement must be completely voluntary on your part, and be made of your own free will without promise or hope of reward, without fear or threat of physical harm, and without coercion or duress?" In addition, defendant signed his name on the form next to his affirmative responses to the latter two questions. The trial court apparently found defendant's waiver valid. Given our holding, *infra* at 68–70, that the police failed scrupulously to honor Bey's exercise of his right to cut off questioning, we do not reach the waiver issue and intimate no view on the trial court's ruling.

and hence inadmissible. *See, e.g., State v. Hartley, supra,* 103 *N.J.* 271–78. At the outset, we note that as defendant raises *this* objection to the admissibility of his confession for the first time on appeal, the claim must satisfy the more exacting "plain error" standard of appellate review.[7] *State v. Macon,* 57 *N.J.* 325, 333–41 (1971); *State v. Melton,* 136 *N.J.Super.* 378, 381 (App.Div.1975). This standard, as summarized in *State v. Cza-chor,* 82 *N.J.* 392, 402 (1980), permits reversal only when "under the circumstances 'the error possessed a clear capacity for producing an unjust result,' * * * that is, 'one sufficient to cause a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached' " (citations omitted). *See R.* 2:10–2.

Resolution of Bey's self-incrimination claim requires us to address the following three issues: (1) Did the defendant sufficiently invoke his right to remain silent? (2) If so, did the police fail scrupulously to honor his right to cut off questioning by continuing the interrogation? and (3) Assuming the police did not scrupulously honor defendant's right to remain silent, did his subsequent express waiver render the written confession admissible? As in *Hartley, supra,* we base our analysis and conclusions on both federal constitutional law and our State common-law privilege against self-incrimination. 103 *N.J.* at 284; *see State v. Stever,* 107 *N.J.* 543, 556 ("right to be free from compelled self incrimination * * * [is] firmly established

---

[7]Because the defendant failed to argue this theory to the trial court, no findings were made with respect to his asserted invocation of the right to remain silent and the subsequent conduct of the police. However, given the adequacy and clarity of the record, and the peculiar source of the crucial testimony, we feel that the operative facts are plain and that a remand would be useless and wasteful. *See State v. Sugar,* 108 *N.J.* 151, 159–60 1987) (*Sugar III* ) (remand not necessary if evidence does not "pose issues of credibility or require the subjective and intuitive evaluations of a trial court"); *Brown v. Illinois,* 422 *U.S.* 590, 604, 95 *S.Ct.* 2254, 2262, 45 *L.Ed.*2d 416, 427 (1975) (court would make original findings to determine admissibility of confession where record was ample rather than remand); *cf. R.* 2:10–5 (original appellate jurisdiction).

as part of our state common law"), *cert. denied,* —— *U.S.* ——, 108 *S.Ct.* 348, 98 *L.Ed.*2d 373 (1987).[8]

█ The testimony set out above establishes that contemporaneously with the reading of his rights, defendant was informed that the police wished to question him about Cheryl Alston. According to Investigator George, who had been involved in the interrogation since Bey's arrival at the station that afternoon, defendant immediately "indicated he did not want to talk to us about it * * *." Detective Green corroborated the timing and substance of the exchange, testifying that immediately after defendant was "re-Mirandized," he was asked about Cheryl Alston, and indicated no involvement in the crime. Defendant testified simply, "I wasn't saying nothing."

*Miranda* itself stated that an accused could indicate his desire to remain silent in *"any manner,* at any time prior to or during questioning." 384 *U.S.* at 473–74, 86 *S.Ct.* at 1627, 16 *L.Ed.*2d at 723 (emphasis supplied). Although the three versions of defendant's interrogation are not perfectly identical, they portray a consistent picture with respect to the substance of the crucial moments. The police raised the topic of Cheryl Alston, and Bey in effect told them he would have nothing to say.[9] His actions were clearly sufficient to trigger the relevant constitutional protections afforded a criminal suspect undergoing custodial interrogation.

█ We have held that a request to terminate an interrogation must be honored "however ambiguous." *State v. Kenne-*

---

[8]We note that Bey makes no claim that he invoked his fifth amendment right to have counsel present, and thus the rules set out in *Edwards v. Arizona,* 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378, reh'g denied, 452 *U.S.* 973, 101 *S.Ct.* 3128, 69 *L.Ed.*2d 984 (1981), and *Oregon v. Bradshaw,* 462 *U.S.* 1039, 103 *S.Ct.* 2830, 77 *L.Ed.*2d 405 (1983), are not implicated in this case.

[9]The State's assertion that George's pretrial testimony was mistaken ignores the fact that George re-affirmed his version of events at trial, testifying that when asked about Alston, Bey said "he did not want to discuss it," and ignores as well the inherent, objective reliability of such testimony, given its source.

_dy,_ 97 _N.J._ 278, 288 (1984); _see also State v. Wright,_ 97 _N.J._
113, 119–20 (1984) (equivocal invocation of right to counsel must
be "interpreted in the light most favorable to defendant");
_State v. McCloskey,_ 90 _N.J._ 18, 26 n. 1 (1982) (same); _cf. id._ at
25 (courts assume defendants seek the advantage of basic
protections such as the right to remain silent, and will "indulge
every reasonable presumption against waiver"). The over-
whelming majority of courts have agreed that "any declaration
of a desire to terminate the contact or inquiry * * * should
suffice." W. LaFave & J. Israel, _Criminal Procedure_ § 6.9(e)
at 310 (1985); _accord Christopher v. Florida,_ 824 _F._2d 836, 841
(11th Cir.1987) (reversing murder conviction) ("equivocal indica-
tion of a desire to remain silent" has same effect as unequivo-
cal indication; "suspect need not 'clearly ask that the interroga-
tion stop' "); _Martin v. Wainwright,_ 770 _F._2d 918, 924 n. 6
(11th Cir.1985) (suspect need not "use talismanic words" to
invoke rights), _cert._ denied, 479 _U.S._ 909, 107 _S.Ct._ 307, 93
_L.Ed._2d 281 (1986); _Tucker v. State,_ 411 _A._2d 603, 605 (Del.
1980) (right to silence invoked when suspect declined to make
statement); _State v. Bishop,_ 49 _Or.App._ 1023, 1025, 621 _P._2d
1196, 1198 (1980) (statement "I don't want to talk about it"
"made clear that defendant wanted to remain silent"); _State v.
Toms,_ 28 _N.C.App._ 394, 395, 221 _S.E._2d 94, 96 (1976) (same); _cf.
Smith v. Illinois,_ 469 _U.S._ 91, 105 _S.Ct._ 490, 83 _L.Ed._2d 488
(1984) ("accused's post-request responses to further interroga-
tion may not be used to cast retrospective doubt on the clarity
of the initial request"). Defendant was not required to express
his desire with the utmost of legal precision.[10]

---

[10]Even if defendant's conduct and remarks are treated as equivocal, and the
police reasonably were unsure of defendant's wishes, their subsequent ex-
changes with him would have been narrowly restricted to _clarifying_ the
meaning of his statements. _See State v. Wright, supra,_ 97 _N.J._ at 120 & n. 4; _see
also Martin v. Wainwright, supra,_ 70 _F._2d at 923–24; _United States v. Lopez–
Diaz,_ 630 _F._2d 661, 665 (9th Cir.1980); _United States v. Riggs,_ 537 _F._2d 1219,
1222 (4th Cir.1976). There has been no suggestion by the State that the

Having found that defendant did invoke his right to remain silent during a custodial interrogation, we turn to the question whether his exercise of that right was "fully honored," *Miranda v. Arizona, supra,* 384 *U.S.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719, meaning, in this context, whether his " 'right to cut off questioning' was 'scrupulously honored.' " *Michigan v. Mosley, supra,* 423 *U.S.* at 104, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 321; *see State v. Hartley, supra,* 103 *N.J.* at 260 (right to remain silent must be "properly respected"); *State v. Kennedy, supra,* 97 *N.J.* at 288 (request to terminate interrogation must be "diligently honored"). In a line of cases stretching from *Miranda* to *Mosley* to *Hartley,* the parameters and content of the "scrupulously honor" concept have been developed. In *Miranda* the Court addressed the situation of a suspect invoking his rights during questioning:

If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. [384 *U.S.* at 473-74, 86 *S.Ct.* at 1627-28, 16 *L.Ed.*2d at 723.]

*See also id.* at 445, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707 (if an "individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him").

In *Mosley, supra,* the Supreme Court was required to interpret and apply the foregoing *Miranda* passages. 423 *U.S.* at 100, 96 *S.Ct.* at 325, 46 *L.Ed.*2d at 319. There, the police had ceased questioning the defendant when he initially refused to speak about certain robberies, but two hours later recommenced interrogation at a different location concerning a different criminal matter; the second session was conducted by a different officer and preceded by a re-reading of defendant's

---

questioning following defendant's invocation should be categorized as attempts at clarification.

rights. *Id.* at 97–98, 96 *S.Ct.* at 323–24, 46 *L.Ed.*2d at 317–18. The *Mosley* Court concluded that the "critical safeguard" contained in the relevant *Miranda* passage was the "right to cut off questioning," *id.* at 104, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 321, and held that Mosley's exercise of such right had been fully respected. *Id.* The Court closely reviewed the facts and explained:

> This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation. [*Id.* at 105–06, 96 *S.Ct.* at 327, 46 *L.Ed.*2d at 322.]

In *State v. Hartley, supra,* we focused on *Mosley* and its subsequent treatment in the state and federal courts. 103 *N.J.* at 265–67.[11] The police in *Hartley* initially respected defendant's assertion that he did not want to make a statement and asked him no questions, but roughly one-and-a-half hours later, without a fresh *Miranda* warning, an interrogation was commenced and produced an oral confession. *Id.* at 258–59. The defendant subsequently gave a second oral confession to a different set of officers, who did re-Mirandize him before questioning him. *Id.* at 259.[12] Not entirely sure how the *Mosley* Court would have responded to a different set of facts, we reasoned that

> *Mosley* [left] no room for doubt in at least this respect: the decision of a suspect to remain silent is "scrupulously honored" when (1) the police do not approach him for two hours, (2) he receives fresh *Miranda* warnings, (3) he is questioned by a different officer, and (4) he is questioned in respect of an

---

[11]There has been no suggestion that *Hartley* does not retroactively apply to the facts of this case. *Cf. State v. Stever, supra,* 107 *N.J.* at 550–52 (federal constitutional criminal procedure decisions must be given retroactive effect).

[12]Hartley had been under investigation by State and federal authorities. The first confession was obtained by the FBI, the second by a group of Atlantic County, Atlantic City, and New York State authorities.

offense different from the one for which he is in custody. [*Hartley*, 103 *N.J.* at 266.]

Without addressing the other factors present in *Mosley*, we held that in order scrupulously to honor the rights of a defendant who has attempted to cut off questioning, "the furnishing of fresh Miranda warnings" would be "indispensable" before questioning could be resumed. *Id.* at 267–76. Accordingly, the police in *Hartley* were found *not* to have scrupulously honored the defendant's rights since the initial interrogation after defendant declined to make a statement was not preceded by a fresh warning. *Id.* at 278.

■ The question before us today is easier than that posed in *Hartley;* indeed, it literally answers itself. The record demonstrates that when defendant invoked his right to cut off questioning, the interrogation continued as if nothing had happened. As related by Investigator George, Bey denied knowledge of the incident, the other officers present left the room, and the two "talked in generalities concerning Miss Alston." It was not until forty to forty-five minutes after defendant invoked his right to cut off questioning that George procured his oral confession.

The legal error here is clear. The defendant attempted to exercise his constitutional right to remain silent and cut off questioning. The police officers could not thereafter ignore his wishes and continue to interrogate him about the same incident.[13] We break no new ground in holding that defendant's

---

[13]The record does not establish the precise question or comment that prompted defendant to inculpate himself, but we have no hesitation in concluding it came in response to some form of "interrogation," as defined by *Rhode Island v. Innis,* 446 *U.S.* 291, 100 *S.Ct.* 1682, 64 *L.Ed.*2d 297 (1980). There the Court defined interrogation as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 *S.Ct.* at 1689, 64 *L.Ed.*2d at 308. The initiation of a general discussion about the victim clearly satisfies this standard. *E.g., Christopher v. Florida, supra,* 824 *F.*2d at 845 (generalized discussion relating to investigation constitutes interrogation); *see Anderson v. Smith,*

rights were not scrupulously honored.[14] *Miranda*, it will be recalled, instructed that if a suspect "wishes to remain silent, *the interrogation must cease.*" 384 *U.S.* at 473–74, 86 *S.Ct.* at 1627, 16 *L.Ed.*2d at 723 (emphasis supplied). *Mosley* reaffirmed and strengthened this fundamental interrogation-related right:

> Through the exercise of [a suspect's] option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and *the duration of the interrogation.* The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. [423 *U.S.* at 103–04, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 322 (emphasis supplied).]

---

751 *F.*2d 96, 105 (2d Cir.1984); *State v. Coles, supra,* 28 *Wash.App.* at 564–70, 625 *P.*2d at 715–17. No claim is made by the State that defendant's confession was spontaneous rather than the result of interrogation.

[14]The fact that defendant did eventually give an oral confession has no bearing on the "scrupulously honor" inquiry in this case. In *State v. Hartley, supra,* the author of this opinion disagreed with the Court's conclusion that no waiver issue was posed and dissented. The dissent reasoned that given the specific confluence of facts there presented—(1) the defendant received two full *Miranda* warnings, (2) the police initially respected defendant's right to remain silent, and (3) the challenged police conduct, consisting simply of the failure to provide fresh warnings, and defendant's agreement to talk occurred simultaneously—"the criteria for recognizing a valid waiver of the right to silence necessarily encompass the factors that determine whether the right to silence has been scrupulously honored." *State v. Hartley, supra,* 103 *N.J.* at 315 (Stein, J., dissenting). Further, the dissent was of the view that a per se rule requiring fresh warnings in this context tended to elevate form over substance because it did not "adequately emphasize the substantive conduct required of law enforcement officials," *id.* at 311 n. 4, and because "[w]ith or without fresh *Miranda* warnings, the facts and circumstances of every custodial interrogation must be examined carefully and pragmatically to determine whether a suspect's right to cut off questioning has been protected." *Id.* at 320.

Here there was no initial respecting of defendant's rights, and defendant's statements came over forty-five minutes after the infringing police conduct began. Thus no issue of waiver concerning defendant's oral confession is presented, irrespective of the relevance or irrelevance of waiver analysis to the facts of *Hartley.* Indeed, in *Hartley* the author of this opinion urged the majority to issue "a clear warning to law enforcement officials that inculpatory statements made by the accused after asserting a right to remain silent will be inadmissible if the accused's rights have been overborne by direct or indirect pressure." *Id.* at 311 n. 4.

In holding that the defendant's rights had been respected, the *Mosley* Court took care to stress that it was "not a case * * * where the police failed to honor a decision of a person in custody to cut off questioning * * * by refusing to discontinue the interrogation upon request * * *." *Id.* at 105, 96 *S.Ct.* at 327, 40 *L.Ed.*2d at 322; *see also State v. Hartley, supra,* 103 *N.J.* at 287 ("authorities must cease interrogation of suspect on his request"). We have no doubt that where police continue to interrogate a suspect who has invoked his right to cut off questioning, they fail scrupulously to honor that right. *Accord Christopher v. Florida, supra,* 824 *F.*2d at 840–41, 44–45; *United States v. Poole,* 794 *F.*2d 462, 466 (9th Cir.1986) (officer should have stopped interrogation "immediately" when suspect said he had " 'nothing to talk about' "); *Anderson v. Smith, supra,* 751 *F.*2d at 101–02 (police did not scrupulously honor defendant's rights where defendant sought to terminate questioning but interrogator "plowed ahead"); W. LaFave & J. Israel, *supra,* § 6.9 at 313 ("the 'scrupulously honor' test is not met where the police did not honor the original assertion of the right to remain silent").[15]

 Investigator George's failure scrupulously to honor defendant's right to cut off questioning soon resulted in an oral admission of guilt. Bey then signed a purported waiver of his rights, *see supra* at 62 n. 6, and gave a written confession, introduced in full at defendant's trial. As in *Hartley, supra,* 103 *N.J.* at 271, the admissibility of defendant's second confession turns on the constitutional or non-constitutional nature

---

[15]As in *Hartley,* "we need go no further" than the facts now before us. 103 *N.J.* at 267. We intimate no view regarding how long a cessation is required before questioning may be resumed, or concerning whether a change in location and/or subject-matter is required as well. We note however the *Mosley* Court's observation that to "permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." 423 *U.S.* at 102, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 320.

of the preceding illegality. Where a confession is illegally obtained in violation only of *Miranda*'s procedural or "prophylactic" dictates (*e.g.*, an unwarned confession), it is inadmissible in the prosecution's case-in-chief, but the consequences of the initial illegality are not "irremediable." *Oregon v. Elstad*, 470 *U.S.* 298, 309, 105 *S.Ct.* 1285, 1293, 84 *L.Ed.*2d 222, 232 (1985); *see State v. Hartley, supra,* 103 *N.J.* at 274–76. Subsequent statements or confessions have been held to be admissible if in themselves properly obtained, *i.e.*, given knowingly and voluntarily. *Oregon v. Elstad, supra,* 470 *U.S.* at 309, 105 *S.Ct.* at 1293, 84 *L.Ed.*2d at 232. However, where the illegality infecting the first confession rises to the level of unconstitutional compulsion or coercion—where the police infringe the fifth amendment itself—subsequent statements or confessions must pass muster under the "fruit of the poisonous tree" doctrine and be free of any taint from the earlier constitutional infraction. *State v. Hartley, supra,* 103 *N.J.* at 278–84; *see Oregon v. Elsad, supra,* 470 *U.S.* at 310, 105 *S.Ct.* at 1293, 84 *L.Ed.*2d at 232–33.

■ The task of characterizing the infringement of defendant's rights in this case as constitutional or nonconstitutional is controlled by our reasoning in *Hartley, supra. Hartley* held that where the failure scrupulously to honor a suspect's right to cut off questioning results from the absence of fresh *Miranda* warnings before resuming questioning, the illegality renders the suspect's subsequent inculpatory statement unconstitutionally compelled as a matter of law. 103 *N.J.* at 271. We reasoned that there is a

difference between a failure to administer *Miranda* warnings in the first place, and a failure to honor, after they have been asserted, the constitutional rights that those warnings are designed to secure. In the former instance the police conduct, standing alone and unaccompanied by any oppressive acts of coercion or intimidation, does not inevitably demonstrate an undermining of the in-custody suspect's ability to exercise his free will. * * * [But], if after a suspect avails himself of the Constitution's protections the police violate a right that has been invoked, that violation, by definition, is of constitutional magnitude. [*Hartley, supra,* 103 *N.J.* at 272–73.]

We noted that *Miranda* itself had explained that "any statement taken after [a] person invokes his privilege [to remain silent] cannot be other than the product of compulsion, subtle or otherwise." *Miranda v. Arizona, supra,* 384 *U.S.* at 474, 86 *S.Ct.* at 1678, 16 *L.Ed.*2d at 723, *quoted in State v. Hartley, supra,* 103 *N.J.* at 273. We also found it of "surpassing importance" that the *Elstad* Court, in holding a defendant's second confession admissible notwithstanding an earlier breach of *Miranda*'s prophylactic rules, "took pains to distinguish [those facts] from cases 'concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation.'" *State v. Hartley, supra,* 103 *N.J.* at 276 (quoting *Oregon v. Elstad, supra,* 470 *U.S.* at 312–313 n. 3, 105 *S.Ct.* at 1295 n. 3, 84 *L.Ed.*2d at 234–35 n. 3).

In defendant's case, unlike *Hartley,* the police failed even *initially* to respect his right to cut off questioning. They simply continued the interrogation. We announce no new principle of law in holding that this violated defendant's constitutional and common-law rights and rendered the ensuing oral confession compelled as a matter of law. *State v. Hartley, supra,* 103 *N.J.* at 278 ("the failure to honor a previously-invoked right to silence smacks so inherently of compulsion that any statement following that failure is involuntary by definition").

*Mosley* observed that the critical interrogation-related component of the self-incrimination privilege is the right to cut off questioning. 423 *U.S.* at 103, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 321. But where the police fail to halt the questioning even temporarily, the ensuing danger of coercion and compulsion to confess is great, for the suspect perceives their conduct as an indication that the rights he has just been read mean nothing, and that he is going to be subjected to ongoing interrogation by the police until he talks. *See id.* at 102, 96 *S.Ct.* at 325, 40 *L.Ed.*2d at 320 (momentary cessation of questioning after invocation can "undermine the will of the person being ques-

tioned"); *see also Miranda v. Arizona, supra,* 384 *U.S.* at 474, 86 *S.Ct.* at 1628, 16 *L.Ed.*2d 723 (post-invocation statement "cannot be other than the product of compulsion"); *Martin v. Wainwright, supra,* 770 *F.*2d at 929 n. 14 (any confession obtained after police flatly ignore a suspect's invocation "is likely to be involuntary"); *State v. Hartley, supra,* 103 *N.J.* at 278 (collecting cases); *State v. Hartwig,* 123 *Wis.*2d 278, 284–88, 366 *N.W.*2d 866, 870–71 (1985) (failure scrupulously to honor right to silence was coercive and tainted confession); *State v. Uganiza,* 702 *P.*2d 1352, 1355 (Haw.1985) (same); *Autry v. Texas,* 626 *S.W.*2d 758, 764–65 (Tex.Ct.App.1982) (*en banc*) (applying "fruits" test to *Mosley* violation). *But see Martin v. Wainwright, supra,* 770 *F.*2d at 924–29 (statement made after police failed to terminate interrogation was not compelled). The conclusion is inescapable that defendant's oral statement was unconstitutionally compelled.

■ Finally, we hold that the unconstitutional coercion underlying defendant's oral confession clearly poisoned the written confession as well. *Oregon v. Elstad, supra,* instructed that where "a statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether the coercion has carried over into the second confession." 470 *U.S.* at 310, 105 *S.Ct.* at 1293, 84 *L.Ed.*2d at 232–33; *see State v. Hartley, supra,* 103 *N.J.* at 283. Here there was almost no time between the two confessions, and no change in the place of interrogation or identity of interrogators: the record establishes that defendant orally confessed to George at 12:55 a.m., and by 1:15 a.m. George had retrieved the other detectives and a police typist, instructed Detective Green to re-Mirandize defendant, procured a written waiver, and begun to take defendant's written statement. In effect the two confessions were the product of a single, continuing interrogation, and thus the second is "burdened with the same constitutional infirmities[ ]" as the first, irrespective of the intervening warnings and putative waiver. *State v. Hartley, supra,* 103 *N.J.* at 279–80 (citing

*Westover v. United States,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966); *Leyra v. Denno,* 347 *U.S.* 556, 74 *S.Ct.* 716, 98 *L.Ed.* 948 (1954)). Put another way, where the second confession is so intertwined with the first, it inevitably must be seen as the product of the first and thus wholly tainted by the preceding constitutional violation. *State v. Hartley, supra,* 103 *N.J.* at 284 (second statement coming "on the heels" of compelled statement is "unavoidably tainted"); *accord State v. Hartwig, supra,* 123 *Wis.*2d at 283–87, 366 *N.W.*2d at 869–71 (where police failed scrupulously to honor defendant's right to cut off questioning, subsequent confession obtained after ninety-minute wait, fresh warnings, and written waiver was tainted by earlier violation); *State v. Uganiza, supra,* 702 *P.*2d at 1355 (half-hour wait; same result); *see Jones v. State,* 461 *So.*2d 686, 699–701 (Miss.1984) (reversing capital murder conviction) (court would not reach question of subsequent waiver where police earlier had refused to honor suspect's request to cut off questioning); *cf. Robinson v. Percy,* 738 *F.*2d 214, 221 (7th Cir.1984) (statement *not* tainted by earlier violation where police did discontinue questioning after defendant reaffirmed his desire to remain silent, and defendant initiated the following confession himself). *See generally Wong Sun v. United States,* 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.*2d 441 (1963); *Brown v. Illinois,* 422 *U.S.* 590, 95 *S.Ct.* 2254, 45 *L.Ed.*2d 416 (1975).

To summarize, by failing to scrupulously honor defendant's request to terminate the interrogation the police violated his federal constitutional and state common-law rights, and his oral and written confessions were erroneously introduced at trial. Such error being clearly "sufficient to cause a reasonable doubt as to whether [it] * * * led the jury to a result it otherwise might not have reached," *State v. Czachor, supra,* 82 *N.J.* at 402, defendant's convictions must be reversed.

### III

Defendant also challenges his convictions on the ground that prejudicial mid-trial publicity undermined his right to trial by a

fair and impartial jury, a right squarely guaranteed criminal defendants by the State and federal constitutions. *U.S. Const.* amends. VI, XIV; *N.J. Const. of 1947* art. I, ¶ 10. *See, e.g., State v. Williams,* 93 *N.J.* 39, 59–62 (1983). We have explained that "[t]he securing and preservation of an impartial jury goes to the very essence of a fair trial. * * * [This right] is of exceptional significance. * * * [T]riers of fact must be as nearly impartial 'as the lot of humanity will admit.'" *Id.* at 60 (citation omitted); *accord State v. Corsaro,* 107 *N.J.* 339, 348 (1987) (sanctity of jury role and integrity of jury deliberations "are crucial aspects of a criminal prosecution"); *State v. Biegenwald,* 106 *N.J.* 13, 32 (1987) ("[i]t is axiomatic that a criminal defendant's right to a fair trial requires that he be tried before a jury panel not tainted by prejudice."); *see Irvin v. Dowd,* 366 *U.S.* 717, 722, 81 *S.Ct.* 1639, 1642, 6 *L.Ed.*2d 751, 755 (1961) ("failure to accord an accused a fair hearing violates even the minimal standards of due process").

Of particular significance here is that aspect of impartiality mandating "that the jury's verdict be based on evidence received in open court, not from outside sources." *Sheppard v. Maxwell,* 384 *U.S.* 333, 351, 86 *S.Ct.* 1507, 1516, 16 *L.Ed.*2d 600, 613 (1966). As expressed by Justice Holmes, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado,* 205 *U.S.* 454, 462, 27 *S.Ct.* 556, 558, 51 *L.Ed.* 879, 881 (1907). We recently noted the long-standing nature of this Court's commitment to the "[p]reservation of the jury's independence from extraneous—even judicial —influences." *State v. Corsaro, supra,* 107 *N.J.* at 350. The Court has consistently required trial courts to protect both jurors and their deliberations from illegitimate influences that threaten to taint the verdict. *See, e.g., In re Kozlov,* 79 *N.J.* 232, 239–40 (1979) (trial judges must "seek out and expose outside factors impinging upon the jury's freedom of action and its impartiality and essential integrity"); *State v. Van Duyne,*

43 *N.J.* 369, 386 (1964) (trial courts must "analyze and evaluate carefully the words, attitude and demeanor of a juror when he asserts an impartial mind and one which is free from prejudice regardless of [exposure to] * * * improper newspaper publicity"), *cert. denied,* 380 *U.S.* 987, 85 *S.Ct.* 1359, 14 *L.Ed.*2d 279 (1965); *State v. Jackson,* 43 *N.J.* 148 (1964) (reversing conviction where trial court refused to excuse juror who was friendly with police witnesses despite juror's statement of its irrelevance to credibility), *cert. denied sub nom. Ravenell v. New Jersey,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965); *Wright v. Bernstein,* 23 *N.J.* 284 (1957) (where juror sitting in automobile accident case failed to disclose recent accident involving family member, verdict for plaintiff was reversed despite juror's post-judgment assertions that the accident never entered his mind and that he voted against plaintiff until fourth poll); *State v. Kociolek,* 20 *N.J.* 92 (1955) (Brennan, J.) (reversing capital conviction where defendant produced juror affidavit averring that reference was made to defendant's unrelated assault indictment during deliberations).

We have recently addressed the problems of prejudicial publicity in the context of capital cases in *State v. Williams, supra,* and *State v. Biegenwald, supra.* In *State v. Williams* two capital defendants asserted that their "fair and impartial jury" rights required that the trial courts exclude the public and press from certain pretrial proceedings because of the likely adverse publicity. 93 *N.J.* at 47. We rejected their requests and recognized a constitutional right of access to criminal pretrial proceedings on behalf of the public and press. *Id.* at 59. However, we did state that such proceedings could in certain circumstances be closed to all but the participants. *Id.* at 61.[16] We declared that "the trial court's responsibility under

---

[16]Specifically, the Court held that a pretrial proceeding could be closed "in instances in which the trial court is clearly satisfied that if the pretrial proceeding is conducted in open court there is a realistic likelihood of prejudice to a fair trial by an impartial jury as a result of adverse publicity, and,

both the federal and State Constitutions to preserve the integrity of the jury and minimize the danger that prejudice will infiltrate the adjudicatory process is at its peak in cases involving the death penalty." *Id.* at 63; *see id.* at 61–62, 68–69; *State v. Jackson, supra,* 43 *N.J.* at 158; *State v. Mount,* 30 *N.J.* 195, 213 (1959). This responsibility, we noted, runs "throughout the trial process," extending to "the pretrial stages of the prosecution as well as during trial." *State v. Williams, supra,* 93 *N.J.* at 62–63.

In *State v. Biegenwald,* we focused on the impact of pretrial publicity in relation to defendant's claim that the trial court erred in denying his change of venue motion. The Court noted that while a venue change is appropriate when "necessary to overcome the realistic likelihood of prejudice from pretrial publicity," *State v. Biegenwald, supra,* 106 *N.J.* at 33 (quoting *State v. Williams, supra,* 93 *N.J.* at 67–68 n. 13), where the prejudicial publicity was not so overwhelming as to require the trial court to presume the existence of prejudice, "the appropriate [appellate] inquiry is whether the jury selection process actually resulted in a fair and impartial jury." *State v. Biegenwald, supra,* 106 *N.J.* at 35–36. Some of the impaneled *Biegenwald* jurors had varying degrees of preexisting knowledge of defendant, and thus in approving of the jury that was impaneled we implicitly acknowledged that acceptable jurors need not be entirely ignorant of the matter at hand. *Id.* at 36–37; *accord State v. Van Duyne, supra,* 43 *N.J.* at 385–87; *Murphy v. Florida,* 421 *U.S.* 794, 799–800, 95 *S.Ct.* 2031, 2035–2036, 44 *L.Ed.*2d 589, 594–95 (1975) ("Qualified jurors need not * * * be totally ignorant of the facts and issues"); *Irvin v. Dowd, supra,* 366 *U.S.* at 722–23, 81 *S.Ct.* at 1642, 6 *L.Ed.*2d at 756 (rejecting proposition that "any preconceived notion as to the guilt or innocence of an accused" is sufficient to disqualify

further, that such prejudice cannot be overcome by resort to various methods relating to the selection of jurors that will be available to the court at the time of trial." *State v. Williams, supra,* 93 *N.J.* at 63.

prospective juror); *State v. Allen,* 73 *N.J.* 132, 161 n. 8 (1977) (Pashman, J., concurring) (juror who has seen news reports should not automatically be excused for cause); *see Smith v. Phillips,* 455 *U.S.* 209, 217, 102 *S.Ct.* 940, 946, 78 *L.Ed.*2d 78, 86 (1982) ("due process does not require a new trial every time a juror has been placed in a potentially compromising situation").

The fair trial issue before us today involves not pretrial publicity, but mid-trial publicity of a highly prejudicial nature. From the outset of defendant's prosecution the participants were aware of the likely media interest in the case. As mentioned above, defendant unsuccessfully moved the trial court for an order of sequestration two months prior to the commencement of jury selection. At the *Miranda* hearing the court, counsel, and witnesses spoke in "code" concerning certain aspects of defendant's interrogation so as to avoid explicit references to the Peniston murder. During *voir dire* the court questioned prospective jurors concerning exposure to pretrial publicity, and excused for cause eight of the seventy-one venireman on account of such exposure.[17] Further, the court repeatedly admonished the prospective jurors:

> I might suggest to you that you have some member of your family peruse your newspaper before you get home, before you read it. If there is anything in the newspaper about this case, that they should extract that from the newspaper and save it for you until the case is concluded. You are not to read anything about this case. You are to decide the case strictly on the evidence as you hear it in the courtroom and as you evaluate it.
>
> Should by accident someone read anything about this case in the newspaper, don't discuss it with anybody, but to bring it to my attention as soon as you can. I think with the length of the trial that we may be confronted with in this case, three or four weeks, the better course will be—I don't want to ask you or tell you not to read the local newspapers, but I would suggest that you have some member of the family peruse those newspapers that you get at home. Should

---

[17]In addition to the eight jurors excused on publicity grounds, fourteen others revealed varying degrees of exposure during *voir dire.* Two of these fourteen were excused for cause on other grounds, and the rest were preliminarily qualified. Four of these twelve jurors were eventually impaneled, two sitting and two as alternates.

there be anything in the paper about this case at all, that that be cut out of the paper and perhaps saved for you until this case has been completed. At which time you will be able to read it. In the meantime, you are prohibited from reading anything in the newspaper or listening to any radio or television broadcast, if there be any about this case.

These protective instructions were in substance issued individually to each juror preliminarily qualified by the court,[18] and repeated twice each day at trial, once before lunch and once at the close of the afternoon session.[19]

Jury selection commenced on November 29, 1983. Counsel noted that articles published that day and the next in the *Asbury Park Press* and *Red Bank Register* mentioned defendant's indictment and pending trial for the murder of Carol Peniston, as well as his prior robbery and assault convictions. Five prospective jurors reported reading these articles; three of those were excused for cause. Jury selection continued until December 7th, and trial began the next morning with an unsequestered jury. Coverage of the proceedings continued, primarily in the *Asbury Park Press*, with articles appearing on December 6th, 9th, 10th, and 11th; each of these articles referred to the Peniston indictment.[20] The *Asbury Park Press*

---

[18]Typically the court instructed the jurors when to report back to court, and added:

In the meantime, remember my admonitions. Do not discuss the case with anybody. If anyone attempts to discuss it with you let me know about it. Don't read any newspaper accounts or listen to any radio accounts should there be any. At this point, there has not been any television accounts. Maybe you might follow the suggestions I made about somebody at home cutting out articles, and you don't read them. That would avoid any problems.

[19]Defendant makes much of the fact that apart from the court's instructions to the first panel of veniremen, the jurors were not admonished specifically to bring to the court's attention any exposure to publicity. This omission is not material to our resolution of the issue. The better practice however, in a high-profile trial, would be to include such an admonition in the court's daily protective instructions.

[20]*Jury Selection Continues,* Asbury Park Press, Dec. 6, 1983, at B5, col. 3; *Heat of Passion Led to Murder, Lawyer Tells Jury,* Asbury Park Press, Dec. 9,

also contained a strongly worded commentary criticizing recent sentences in murder cases as overly lenient.[21]

██ Before the jury was brought in for the afternoon session on December 12, defendant's counsel produced these articles and moved the court to declare a mistrial, or in the alternative to poll the jury concerning any exposure to the publicity and to order sequestration. Each of defendant's requests was denied.[22] The court reasoned:

> Now, with regard to those articles that have appeared in the newspapers, with regard to this specific trial, I have admonished the jurors from the first day we started the jury selection, which was on Tuesday, November 29, to the present time, cautioned them not to read any newspaper articles.
>
> As a matter of fact, I went so far as suggested to them and encouraged them to follow that practice where they would have some other member of the family scour the paper before they got it. And if there are any materials with regard to this trial, that they be excised and kept from that particular juror, until such time as their jury service has been completed.
>
> I am satisfied from sitting on many cases that the jury follows the Court's instructions. And in those instances where something may have come to their attention or something happened that they thought they should be bringing to the Court's attention, that has been done. Not only in capital cases but in other cases as well. And in considering this case and the extensive examination of all the prospective jurors, both by the Court and by counsel, I am satisfied and certain that, if anything came to their attention which they thought would prejudice them in any way or they felt that they violated their oath in any way or—they would bring it to the Court's attention.
>
> And not hearing anything from the jurors, I'm satisfied that they haven't read any of these articles.
>
> \* \* \* \* \* \* \* \*
>
> Now, for me, as counsel is suggesting, to inquire of the jury if they read these papers would be going through another *voir dire* of the jury and might

---

1983, at A1, col. 1; *Examiner Says Savage Beating Killed Woman,* Asbury Park Press, Dec. 10, 1983, at A1, col. 1; Asbury Park Press, Dec. 11, 1983, at C5.

[21]*Strange Notions of Crime and Punishment,* Asbury Park Press, Dec. 11, 1983, at C5, col. 3.

[22]Before this Court defendant challenges only the court's refusal to poll the jury, and thus we have no cause to assess the court's denial of his mistrial and sequestration motions.

excite a little bit of interest for them to go look for these articles or read them. I don't know whether it would or wouldn't.

We believe the court erred in relying on its protective instructions alone, and conclude that due to the highly prejudicial nature of the information contained in these articles, and the realistic possibility that it may have reached one or more of the jurors, the court's refusal to poll the jury violated defendant's fair trial rights and requires that his convictions be reversed.

The presumption that jurors will faithfully adhere to the trial court's instructions regarding all facets of their role is not inviolate. As the United States Supreme Court recently recognized in *Smith v. Phillips, supra*, "[t]he safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." 455 *U.S.* at 217, 102 *S.Ct.* at 946, 71 *L.Ed.*2d at 86. This Court has likewise noted the problem:

[In a publicity-laden trial] [a]nother alternative [to sequestration] is clear and definitive instructions to the jury not to read or listen to media reports of the trial and to decide the issues only on evidence presented in open court. *Realistically, however, in many cases it would be difficult to conclude that a jury could avoid receiving such reports* or that such instructions, no matter how forceful, would overcome prejudice to a defendant resulting from the jury learning of a confession or other evidence which the trial court had ruled was inadmissible. [*State v. Allen, supra*, 73 *N.J.* at 142 (emphasis supplied).]

*See id.* at 164 (Pashman, J., concurring) ("realistic expectations should be made of the jury, and in many instances [cautionary instructions] will not suffice").

Hence, notwithstanding the general presumption that jurors act in good faith and seek to comply with the court's instructions, in certain circumstances a criminal defendant whose life or liberty is at stake might reasonably question the efficacy of repeated admonitions. Courts have agreed that publicity-related warnings may be inadequate when inherently prejudicial information has been released or published during a trial in such a manner as to render it likely that one or more of the jurors could have been exposed. *E.g., United States v. Trapnell*, 638 *F.*2d 1016, 1022 (7th Cir.1980) (searching pretrial *voir*

*dire* and repeated admonitions "not to read or listen to accounts of the trial * * * [were not] sufficient to protect [the] jury from prejudicial trial publicity"); *United States v. Lord,* 565 *F.*2d 831, 838 (2d Cir.1977) ("district court erred in relying solely on repetitive admonitions * * * to avoid news coverage"); *United States v. Herring,* 568 *F.*2d 1099, 1104 (5th Cir.1978) (preliminary instructions cautioning jurors to disregard publicity not sufficient to ensure fair trial); *United States v. Pomponio,* 517 *F.*2d 460, 463 (4th Cir.) (though jury is presumed to follow instructions, district court erred in relying on its admonitions where the jury may have been exposed to highly prejudicial reports), *cert. denied,* 423 *U.S.* 1015, 96 *S.Ct.* 448, 46 *L.Ed.*2d 386 (1975); *cf. United States v. Gray,* 788 *F.*2d 1031, 1033 (4th Cir.1986) (repetition of publicity admonition *after* potential exposure was "insufficient"); *State v. Allen, supra,* 73 *N.J.* at 164 (Pashman, J., concurring) (cautionary instructions may be relied on "where news coverage is not widespread, the information contained in the reports does not conflict with testimony proven in court, and it is factual rather than emotional in nature").

In a highly publicized trial, the possibility that a nonsequestered juror might inadvertently observe a news article or headline or overhear a television or radio report is hardly remote. *See Smith v. Phillips, supra,* 455 *U.S.* at 217, 102 *S.Ct.* at 946, 71 *L.Ed.*2d at 86 (noting impossibility of shielding jurors from all contacts or influences); *United States v. Perrotta,* 553 *F.*2d 247, 251 (1st Cir.1977) (where article was "prominently displayed [it] would have been hard for even a conscientious juror to overlook [it]"). Similarly, it is less than fanciful to suppose that in the context of such a trial, human nature might on occasion allow a juror's curiosity concerning press reports to get the better of his good sense. *See United States v. Williams,* 568 *F.*2d 464, 468 (5th Cir.1978) (mid-trial publicity creates "greater opportunities for prejudice" than pretrial publicity because jurors "may be more inclined to seek out this information where [they are] personally involved in the case");

*United States v. Herring, supra,* 568 *F.*2d at 1103 (where article and photographs appeared on front page and jury was not sequestered, "it would defy common sense to suppose that not a single member of the jury had at least glanced at the headline and photograph"). Indeed, during defendant's trial for the Peniston murder, nine months after the Alston trial, it was discovered through the polling procedure that a juror had read an entire article about the case despite repeated instructions not to read the newspapers; the juror had been reading the article above it, and after noticing the one about defendant, read it as "a matter of curiosity." Transcript of proceedings, Sept. 26, 1984, 69–21 to 73–14, *State v. Bey (Bey II)*, 112 *N.J.* 123 (1988). The article contained two references to defendant's murder conviction in this case. *Id.* at 60–20 to 63–1.

█ If, however, a trial court chooses to rely exclusively on its cautionary instructions, such incidents would likely go unmentioned, unless we can be certain of empanelling jurors who would volunteer their infractions to the court and counsel.[23] Accordingly, when a trial court is presented with a post-impanelment motion to question the jury about exposure´ to trial

[23]We note here three other examples of actual or alleged juror irregularities culled from this Court's death-penalty appeals: (1) In this case, it was disclosed on *voir dire* twice that despite the court's admonitions to the venire not to discuss the case, prospective jurors were discussing the case in the jury room. Jury Selection, Nov. 30, 1983, 151–21 to 152–5, Dec. 1, 1983, 70–19 to 72–3; (2) In *State v. Koedatich,* A–1 (N.J., argued Sept. 28, 1987), it was reported in the *Daily Record* after defendant's conviction and death sentence that according to two of the jurors, they and perhaps other jurors had been aware of defendant's other pending murder trial. *Koedatich Defense Wins Juror Appeal,* Daily Record, March 10, 1985, at 1, col. 5; (3) In *State v. Williams,* A–4 (N.J., argued Nov. 10, 1987), a juror was told of articles alleging that the prospective jurors had been investigated on defendant's behalf by the National Jury Project. Trial Record, Jan. 17, 1984, 143–12 to –18. In none of these cases did the juror(s) involved voluntarily inform the court of the respective irregularity. Indeed, in *Williams, supra,* and *Bey II, supra,* the irregularity was discovered only after the court granted counsel's request that the jury be polled. Trial Record, Jan. 17, 1984, 9–15 to 24–12, 142–16 to 143–2, *Williams;* Transcript of Proceedings, Sept. 26, 1984, 63–6 to 65–10, *Bey II.*

publicity, the court should analyze the merits of counsel's proffer through a two-part inquiry. *Cf. Sheppard v. Maxwell, supra,* 384 *U.S.* at 362, 86 *S.Ct.* at 1522, 16 *L.Ed.*2d at 620 ("trial courts must take strong measures to ensure" that accused is tried "by an impartial jury free from outside influences"); *State v. Williams, supra,* 93 *N.J.* at 63 (trial court has "independent duty to act swiftly and decisively to overcome the potential bias of a jury from outside influences").[24]

The court should first examine the information disseminated to determine if it has the capacity to prejudice the defendant. *See Virgin Islands v. Dowling,* 814 *F.*2d 134, 138 (3rd Cir.1987); *United States v. Gray, supra,* 788 *F.*2d at 1032; *United States v. Manzella,* 782 *F.*2d 533, 542 (5th Cir.), *cert. denied sub nom. Jiminez v. United States,* 476 *U.S.* 1123, 106 *S.Ct.* 1991, 90 *L.Ed.*2d 672 (1986); *United States v. Hood,* 593 *F.*2d 293, 296 (8th Cir.1979); *United States v. Perrotta, supra,* 553 *F.*2d at 250. One court has identified "the timing of the media coverage and its possible effects on legal defenses" as factors to be considered. *United States v. Manzella, supra,* 782 *F.*2d at 542.

■ Obviously, reports of a confession or of inculpatory physical evidence that the court has ordered suppressed, or of proceedings held outside the presence of the jury, can give rise to potential prejudice. *See Virgin Islands v. Dowling, supra,* 814 *F.*2d at 139 ("[e]xtra-record information about the case" such as defendant's attempt to enter non-vult guilty plea may

---

24We note that a timely motion, accompanied by evidence of the information disseminated and the manner of its dissemination, is indispensable. *See United States v. Porcaro,* 648 *F.*2d 753, 757 (1st Cir.1981); *United States v. Giacalone,* 574 *F.*2d 328, 336 (6th Cir.), *cert. denied,* 439 *U.S.* 834, 99 *S.Ct.* 114, 58 *L.Ed.*2d 129, *reh'g denied,* 439 *U.S.* 998, 99 *S.Ct.* 601, 58 *L.Ed.*2d 672 (1978); *cf. State v. Williams, supra,* 93 *N.J.* at 64 (motion for closure of pretrial proceedings must be accompanied by evidence of adverse publicity). As noted by the First Circuit, for an appellate court the "considerations will, of course, be altogether different where inquiry of the jury is not seasonably requested." *United States v. Perrotta, supra,* 553 *F.*2d at 251 n. 9; *see United States v. Porcaro, supra,* 648 *F.*2d at 757–58.

be prejudicial); *United States v. Williams*, 809 *F*.2d 1072, 1092 (5th Cir.) (publicity referring to revocation of defendant's bail after damaging testimony could prejudice jury by putting judge's "official imprimatur" on its credibility), *reh'g denied*, 817 *F*.2d 1136, *reh'g granted*, 828 *F*.2d 1, *cert. denied*, — *U.S.* —, 108 *S.Ct.* 259, 98 *L.Ed.*2d 216 (1987); *United States v. Perotta, supra*, 553 *F*.2d at 250–51 (article reporting that district court had characterized suppressed evidence as extremely prejudicial could suggest to jury the existence of "serious evidence" of defendant's guilt).

Likewise, publicity referring to a pending indictment or prior conviction could gravely prejudice defendant's rights to a fair trial. *See, e.g., Marshall v. United States*, 360 *U.S.* 310, 312–13, 79 *S.Ct.* 1171, 1172–73, 3 *L.Ed.*2d 1250, 1251–52 (1959) (reversing conviction where jurors learned of prior convictions); *State v. Kociolek, supra*, 20 *N.J.* at 96 (juror knowledge of pending assault indictment in death phase of murder trial "would be calculated to disparage the defendant in the minds of the jurors"); *Virgin Islands v. Dowling, supra*, 814 *F*.2d at 138 (publicity referring to prior convictions or criminal activities "carries great potential" for prejudice); *United States v. Gray, supra*, 788 *F*.2d at 1032–33 (article charging that defendant had previously been acquitted of "masterminding a $30 million dollar Amsterdam-to-New York heroin ring" satisfied prejudice threshold); *United States v. Pomponio, supra*, 517 *F*.2d at 462–63 (article disclosing that current trial was for ten counts of 113 count indictment was prejudicial).[25]

---

[25]When the allegedly prejudicial information, or its substantive equivalent, has been or will be admitted into evidence, the danger of actual prejudice to the accused may be greatly lessened. *See United States v. Hood, supra*, 593 *F*.2d at 297 (where articles referred to defendant's arrest for an offense the jury had not learned of, but defendant had already testified about prior arrests for murder, kidnapping, and armed robbery, trial court did not err in finding that threshold prejudice requirement had not been satisfied). Mere admission of the evidence or its equivalent into the trial record does not, however, negate the need for trial court analysis, since the admission of certain evidence is

If the court is satisfied that the published information has the capacity to prejudice the defendant, it should determine if there is a realistic possibility that such information may have reached one or more of the jurors. *United States v. Manzella, supra,* 782 *F.*2d at 542. Relevant considerations include the extent, notoriety, and prominence of the media coverage, with particular reference to the aspects found potentially prejudicial by the Court. *E.g., United States v. Williams, supra,* 809 *F.*2d at 1092 (noting that challenged publicity "was extensive, including front-page color photographs with accompanying headlines visible at any newspaper vending machine"); *United States v. Manzella, supra,* 782 *F.*2d at 543 (pointing out that prejudicial information was found in "one small paragraph at the end of the medium-length article"); *United States v. Trapnell, supra,* 638 *F.*2d at 1022–23 (holding it could "reasonably be believed" that jurors were exposed to publicity disseminated in local newspaper and radio reports).

Where the court concludes there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of jury, it should conduct a *voir dire* to determine whether any exposure has occurred.[26] If there is any indication of such exposure or

---

often accompanied by cautionary limiting instructions obviously not contained in the media report. *See Marshall v. United States, supra,* 360 *U.S.* at 312–13, 79 *S.Ct.* at 1172–73, 3 *L.Ed.*2d at 1252 (prejudice may be greater when evidence reaches jurors extra-judicially rather than in court because it is not "tempered by protective procedures").

[26]Though the form and content of this initial questioning is better left within the trial court's sound discretion, we note that a practice of polling the jurors individually, in camera, is likely to be more effective in uncovering any exposure than is questioning the jury *en banc,* in open court. *Virgin Islands v. Dowling, supra,* 814 *F.*2d at 137–38; *United States v. Williams, supra,* 568 *F.*2d at 466 & n. 3; *see United States v. Hood, supra,* 593 *F.*2d at 296 (initial polling must be individual); *ABA Standards Relating to Fair Trial and Free Press* § 3.5(f) (1968) (same) (reproduced at 88 n. 28 *infra*). *But see United States v. Gaggi,* 811 *F.*2d 47, 51 (2d Cir.) (no preference expressed), *cert. denied,* — U.S. ——, 107 *S.Ct.* 3214, 96 *L.Ed.*2d 701 (1987); *Micinski v. Indiana,* 487

knowledge of extra-judicial information, the court should question those jurors individually in order to determine precisely what was learned, and establish whether they are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court.[27] We note that such a procedure is in general accord

---

*N.E.*2d 150, 155 (Ind.1986) (approving of *en banc* inquiry). While the *further* questioning of any juror who indicates exposure must be conducted individually, *infra* at 86–87 & n. 27, we do not adopt here a fixed rule regarding the court's initial interrogation, *see Virgin Islands v. Dowling, supra,* 814 *F.*2d at 137–38; *United States v. Perrotta, supra,* 553 *F.*2d at 250 n. 6, since each case will arise in a different factual context. Similarly, because the extent of the publicity, type of media, and nature of the information involved will vary from case to case, we leave the content of the initial questioning to the trial court. Some courts have used a general question regarding all publicity, as opposed to one referring to specific press, television or radio reports. *See Micinski v. Indiana, supra,* 487 *N.E.*2d at 155 (use of general question); *cf. United States v. Balistrieri,* 779 *F.*2d 1191, 1213–14 (7th Cir.1985) (use of cautionary instruction omitting any reference to particular news reports), *cert. denied,* 477 U.S. 908, 106 *S.Ct.* 3284, 91 *L.Ed.*2d 573 (1986).

[27]This examination should be conducted in a manner consonant with pretrial *voir dire* procedure, *i.e.,* on the record, with counsel present. *See, e.g., Virgin Islands v. Dowling, supra,* 814 *F.*2d at 139–40. The objective is to "ascertain the extent and effect of the infection," *United States v. Hood, supra,* 593 *F.*2d at 296, and decide what measures are necessary to protect the defendant's rights. Settled pretrial *voir dire* principles should guide the court in choosing an appropriate course of action: just as the jury selection case law does not demand that juror be totally ignorant of the facts, *see supra* at 77–78, a juror need not be automatically excused due to midtrial exposure to publicity disclosing inadmissible evidence. *See United States v. Williams,* 568 *F.*2d at 470. If the exposure was inadvertent and the information gleaned harmless, or forgotten, the court could properly send the juror back to the panel with a warning to be more careful in avoiding publicity. *See United States v. Gaggi, supra,* 811 *F.*2d at 51–52 (publicity did not refer to defendant); *United States v. Manzella,* 782 *F.*2d at 541 (jurors were exposed to article containing prejudicial information but did not learn of prejudicial aspects); *cf. United States v. Powell,* 771 *F.*2d 1173, 1175 (8th Cir.1985) (post-verdict poll revealed exposure but juror did not remember contents of article). Conversely, where a juror has learned of facts that would require his excusal for cause at the pretrial stage, he must be excused and an alternate substituted. *See United States v. Williams,*

with the recommendations of the ABA, American Bar Association Standards for Criminal Justice, *Standards Relating to Fair Trial and Free Press* § 8–3.5(f) (1978),[28] and the overwhelming majority of courts to have considered the matter.

*supra,* 568 F.2d at 470–71 (reversing conviction where jurors who saw newscast disclosing that defendants had previously been convicted of the same charges were not excused). If a juror has learned of information that would not automatically require his dismissal but that is prejudicial nevertheless, the court should exercise its discretion in light of the fundamental requirement of impartiality. *See United States v. Gaggi, supra,* 811 F.2d at 52; *United States v. Williams,* 568 F.2d at 470. In some circumstances, based on its questioning and observation of the juror, the court may feel that an admonition or explanation is sufficient, *cf. State v. Williams, supra,* 93 N.J. at 68 n. 16 (collecting studies finding admonitions effective); *United States v. Balistrieri, supra,* 779 F.2d at 1213–14 (court explained to jury why prejudicial headline was misleading), but it should not accept juror protestations of unaffected impartiality as dispositive. *Virgin Islands v. Dowling, supra,* 814 F.2d at 139–41 (bias or impartiality must be determined by court, not by affected jurors); *United States v. Manzella, supra,* 782 F.2d at 541 (jurors' assertions of continued impartiality "not dispositive"); *see Marshall v. United States, supra,* 360 U.S. at 312, 79 S.Ct. at 1172, 3 L.Ed.2d at 1252 (reversing conviction despite exposed jurors' promises to decide case solely on record); *State v. Deatore,* 70 N.J. 100, 105–06 (1976) (juror disclaimer of partiality not sufficient); *State v. Van Duyne, supra,* 43 N.J. at 386 (trial court should "evaluate carefully the words, attitude and demeanor of the juror when he asserts an impartial mind [notwithstanding exposure to prejudicial publicity] * * " and excuse such juror despite "the disavowal [if] the trial court has any lingering doubt about the juror's capacity for impartiality"); *cf. United States v. Gaggi, supra,* 811 F.2d at 51–52 (court properly exercised its discretion in leaving exposed jurors in case where decision was not based strictly on jurors' assertions).

[28]The standard reads:

> If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material. The examination shall take place in the presence of counsel, and an accurate record of the examination shall be kept. The standard for excusing a juror who is challenged on the basis of such exposure shall be the same as the standard of acceptability recommended in standard 8–3.5(b) [pretrial *voir dire* ], except that a juror who has seen or heard reports of potentially prejudicial material shall be excused if reference to the material in question at the trial itself would have required a mistrial to be declared.

*See, e.g., Virgin Islands v. Dowling, supra,* 814 *F*.2d at 139; *United States v. Gaggi, supra,* 811 *F*.2d at 51; *United States v. Williams, supra,* 809 *F*.2d at 1091–92; *United States v. Trapnell, supra,* 638 *F*.2d at 1022; *United States v. Hood, supra,* 593 *F*.2d at 296; *United States v. Perrotta, supra,* 553 *F*.2d at 249–50; *United States v. Pomponio, supra,* 517 *F*.2d at 463; *Micinski v. State,* 487 *N.E*.2d 150, 155 (Ind.1986); *State v. Jasuilewicz,* 205 *N.J.Super.* 558, 568 (App.Div.1985), *certif. denied,* 103 *N.J.* 467 (1986); *People v. Sundaresh,* 153 *Ill.App.* 3d 930, 935–38, 106 *Ill.Dec.* 872, 875–76, 506 *N.E*.2d 672, 675–76 (Ill.App.), *appeal dismissed,* 116 *Ill.*2d 572, 113 *Ill.Dec.* 313, 515 *N.E*.2d 122 (1987); *Kruse v. State,* 483 *So.*2d 1383 (Fla.Dist.Ct. App.1986), *cause dismissed,* 507 *So.*2d 588 (1987); *State v. Allen, supra,* 73 *N.J.* at 163 (Pashman, J., concurring). *But see United States v. Metzger,* 778 *F*.2d 1195, 1209 (6th Cir.1985), *cert. denied,* 477 *U.S.* 906, 106 *S.Ct.* 3279, 91 *L.Ed.*2d 568 (1986).

 The procedure of questioning an impaneled jury when prejudicial publicity threatens the fairness and integrity of a defendant's trial should not be invoked begrudingly. While we do not mean to suggest that *any* publicity relating to the defendant or the proceedings will automatically require that the jury be polled, *see United States v. Lord, supra,* 565 *F*.2d at 838 (polling not required if information disseminated was "clearly innocuous" or possibility of jury exposure was "remote"), a court might properly choose to err on the side of caution when ruling on such motions. *Cf. State v. Williams, supra,* 93 *N.J.* at 68 (to guarantee an impartial jury courts may resolve doubts in favor of accused in excusing jurors for cause). The procedure is prophylactic in nature, designed to uncover potential prejudice to extremely significant constitutional rights that might otherwise go wholly undetected, and to do so at a time when corrective measures remain possible, that is, before ordering a new trial has become the only option. Hence the polling procedure operates to safeguard the rights of the accused and vindicate societal interests in the fair and efficient

administration of the criminal justice system. Further, in contrast to the publicity-related measures discussed in *State v. Biegenwald, supra,* 106 *N.J.* at 33 (change of venue), and *State v. Williams, supra,* 93 *N.J.* at 63–67 (closure of pretrial proceedings), the mid-trial *voir dire* imposes a minimal burden on the court system.

In *Sheppard v. Maxwell, supra,* the Supreme Court instructed that in resolving conflicts between a defendant's fair trial rights and the first amendment free press guarantees, courts "must take strong measures to ensure that the balance is never weighed against the accused." 384 *U.S.* at 362, 86 *S.Ct.* at 1522, 16 *L.Ed.*2d at 620. At the same time, the Court wisely added, "we must remember that reversals are but palliatives; *the cure lies in those remedial measures that will prevent prejudice at its inception.*" *Id.* at 363, 86 *S.Ct.* at 1522, 16 *L.Ed.*2d at 620 (emphasis supplied); *accord State v. Van Duyne, supra,* 43 *N.J.* at 387 (reversing convictions infected by prejudicial publicity "is an expedient and not a cure").

In this case, as noted, the midtrial publicity brought to the court's attention disclosed that defendant was going to be tried for a second murder after the completion of the first trial. Jurors exposed to this publicity could have discovered that the second murder was committed close in time and in a similar manner to the Alston murder. It is hard to imagine publicity with a greater capacity to prejudice a defendant's case. The trial court itself concluded as much, as during jury selection it excused for cause any juror who knew of the second indictment. The court made no finding with respect to the likelihood of the jury's exposure to this publicity, but did subsequently grant defendant's sequestration motion, on December 14th, in part "to preclude any direct or indirect communication with [the jury] that might prejudice either the defendant or the State." We believe the repeated coverage in the local press created a realistic possibility that at the time of defendant's motion, the information may have reached one or more of the jurors.

Had the trial court questioned the jurors in accordance with defense counsel's request, it could have taken whatever steps were necessary to ensure that defendant's trial would proceed with a fair and impartial jury. Such an inquiry might have revealed that no exposure to the publicity had occurred at all. However, we cannot assume that this was the case, or, if some exposure did occur, that it had no effect on the juror's impartiality. *See United States v. Trapnell, supra,* 638 *F.*2d at 1023; *United States v. Perrotta,* 553 *F.*2d at 251; *United States ex rel Greene v. New Jersey,* 519 *F.*2d 1356 (3rd Cir. 1975); *cf. Virgin Islands v. Dowling, supra,* 814 *F.*2d at 140 (where court did poll jury but used inadequate question, court would not "speculate what the jurors' responses would have been to an *appropriate* inquiry") (emphasis supplied). We hold that where a timely, properly supported midtrial motion to poll the jury concerning prejudicial publicity is refused, and there is a realistic possibility that information with the capacity to prejudice the defendant may have reached one or more members of the jury, the defendant must be given a new trial. *See, e.g., United States v. Williams, supra,* 809 *F.*2d at 1093; *United States v. Gray, supra,* 788 *F.*2d at 1033; *United States v. Pomponio, supra,* 517 *F.*2d at 463; *People v. Sundaresh, supra,* 153 *Ill.App.*3d at 935–38, 106 *Ill.Dec.* at 875–76, 506 *N.E.*2d at 675–76; *Kruse v. State, supra,* 483 *So.*2d at 1388. Accordingly, defendant's convictions must be reversed on this ground as well.

Justice Handler, in his thoughtful and provocative concurring opinion, suggests that the Court's resolution of the confession and mid-trial publicity issues reflects an "application of an enhanced standard of appellate review to capital cases." *Post* at 105. We disagree with that assessment. Our reversal of defendant's convictions in this case is based on well-established legal principles. As noted, defendant's contentions regarding his confession are based on familiar constitutional doctrine, and our decision constitutes a straightforward application of *Miranda v. Arizona, supra,* and *Michigan v. Mosley, supra,*

*Ante* at 62, 68–74. Further, with respect to the trial court's failure to poll the jury about exposure to media reports, we have gone no further than to adopt the approach accepted by the majority of states that have considered the matter for capital and noncapital cases alike. *Ante* at 86–89. Nevertheless, we offer these observations concerning Justice Handler's proposed standard of review in capital cases in order to illuminate what we perceive as a distinct, although qualitatively narrow, difference between that standard and the one we apply in this case and in *Bey II.*

Our concurring colleague proposes a two-pronged standard of appellate review in capital cases. The first step is that "the reviewing court must exercise heightened scrutiny of the record and independence in making its own findings with respect to trial court rulings and determinations." *Post* at 117. This heightened scrutiny of the record applies to "all phases of a capital murder prosecution, including the accusatory, pretrial, and trial stages," *id.* at 117, and has the virtue of enabling an appellate court "to see the case as a whole," and to evaluate any error identified "both for its individual effect on deliberations and for its effect on the structure of the entire case." *Id.* at 118–19.

 We find no significant distinction between our meticulous and comprehensive procedure for reviewing capital cases and that espoused by Justice Handler as the first step of the standard of review he proposes. We acknowledge that the death sentence and capital proceedings differ in several respects from incarceration and noncapital prosecutions. *See, e.g., California v. Ramos,* 463 *U.S.* 992, 998–99, 103 *S.Ct.* 3446, 3451–52, 77 *L.Ed.*2d 1171, 1179 (1983) ("qualitative difference of death * * * requires a correspondingly greater degree of scrutiny of the capital sentencing determination"); *State v. Williams, supra,* 93 *N.J.* at 61 (importance of fair trial requirements heightened in death cases). We believe that in death

penalty cases an appellate court must subject the record to intense scrutiny. The stark fact that a litigant's life is at stake intensifies the obligation of judicial review. Accordingly, not only do we agree with the first step of Justice Handler's formulation describing the required scope of appellate review in capital cases, we have engaged in that very meticulous and searching review of the record in every capital case that has come before us.

The second step in the review process advocated by Justice Handler consists of a substantive test for determining when error in a capital case requires reversal of either the conviction or the sentence. The concurring opinion suggests that if the error is of constitutional dimension, such error is reversible unless it had "no effect" on the determination to impose the death sentence, citing *Caldwell v. Mississippi*, 472 *U.S.* 320, 105 *S.Ct.* 2633, 86 *L.Ed.*2d 231 (1985). *Post* at 116. In the case of non-constitutional error, Justice Handler would require reversal unless the State could demonstrate that "there was no realistic likelihood of prejudice arising from the error." *Id.* at 116.

We observe initially that our decision in neither this case nor *Bey II, supra,* would be affected by the second prong of Justice Handler's formulation. Although the concurrence suggests that our reversal of defendant's conviction implicitly reflects an "enhanced standard of review," *post* at 105, reversal in this case is mandated by a straightforward application of *Rule* 2:10–2. Both the admission of defendant's coerced confession and the trial court's failure to poll the jury about exposure to mid-trial publicity were errors "clearly capable of producing an unjust result," and no more rigorous test for ascertaining whether error is prejudicial was required to justify reversal of the convictions. Additionally, the concurring opinion challenges the Court's decision in *Bey II* for allegedly failing to apply an enhanced standard of review. *Post* at 105–106. But on the critical question of the admissibility of the confession in that case, the majority opinion concludes, after a meticulous

review of the record, that it was not error for the trial court to have admitted the confession into evidence. *State v. Bey II, supra,* 112 *N.J.* at 140–43. Hence, Justice Handler's proposed standard for determining when error is reversible would not have affected the majority's conclusion on the admissibility of the confession.

Substantively, the test espoused by Justice Handler for determining whether error in a capital case is reversible, stated simply, is a test somewhat less tolerant of the effect of error than is the harmless-error analysis that we apply. The difference appears to be one of degree rather than concept. Under either formulation, the inquiry concerns whether the error contributed to the verdict or the sentence. We are reminded of Chief Justice Weintraub's commentary on the purpoted distinction between the federal and California tests for harmless error:

It seems to us that *Chapman,* like *Fahy,* offers no real guidance as to the degree of "possibility" which will require a new trial. As *Chapman* itself says, it intended no more than a restatement of *Fahy* when it required a finding "beyond a reasonable doubt" that the error did not contribute to the verdict. The "reasonable doubt" of *Chapman* is no more concrete than the "reasonable possibility" of *Fahy.* A "reasonable doubt," by its historic definition in the area of fact-finding, does not mean any conceivable doubt, and it can mean nothing else here.

Stated affirmatively, the proposition is that a new trial shall be ordered if there is a reasonable doubt as to whether the constitutional error contributed to the verdict. It seems to us that this is the way judges have always approached the subject of "harmless" error, whatever the verbal framework within which the subject has been cast. A judge would hardly insist an error, "constitutional" or other, was "harmless" if he found a "reasonable" doubt as to whether the error contributed to the result. What continues to defy articulation is the process which leads a judge to say there is a doubt and that the doubt is or is not a reasonable one. The circumstances are too infinite and the appellate judgment too laden with discretion to admit of formulary aid. [*State v. Macon,* 57 *N.J.* 325, 340 (1971).]

Thus, in assessing the impact of error in either the guilt or penalty phase of a capital case, we shall continue to determine reversibility on the basis of a qualitative determination that considers, in the context of the entire case, whether the error was clearly capable of affecting either the verdict or the

sentence. The only exception involves "constitutional violations * * * [that] by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite v. Texas,* — *U.S.* ——, 108 *S.Ct.* 1792, 1795, 100 *L.Ed.*2d 284 (1988). Although we do not adopt the second prong of Justice Handler's formulation, we discern that his test, like ours, focuses on the probable relationship between error and result. In our view, the same standard for determining whether error is reversible is to be applied in both capital and noncapital cases. We are satisfied that its application in capital cases is sufficiently flexible to accommodate our heightened concerns and responsibilities in reviewing death-penalty prosecutions.

We are also confident that that standard, when applied to a jury's determination in the sentencing phase of a capital case, can accommodate the highly discretionary nature of the jury's duty to balance the statutory aggravating and mitigating factors. We foresee that the identification of error clearly capable of affecting the jury's weighing process in the sentencing phase will occur with a full appreciation of both the peculiarly subjective nature of the jury's function and the consequences of its verdict.

## IV

Because the issue may arise should defendant be re-tried, considerations of judicial economy dictate that the Court address his claims pertaining to the applicability of the death penalty statute given his juvenile status at the time of the offense. *Cf. State v. Sugar,* 100 *N.J.* 214, 235–36 (1985) (*Sugar II*) (instructing lower court on law to apply at new suppression hearing after reversing conviction). As indicated above, we hold that the statute may not be applied to defendant for the murder of Cheryl Alston.

At the time of defendant's trial in late 1983, *N.J.S.A.* 2C:11-3 was silent on the propriety of applying its death penalty provi-

sions to juveniles tried as adults and convicted of knowing or purposeful murder. Section c, without qualification, governed the sentencing of "[a]ny person convicted under subsection a(1) or (2)." [29] The Monmouth County Prosecutor's Office, assuming that juveniles could be properly sentenced under section c, commenced its prosecution against defendant as a capital case. *See supra* at 54–55. From the inception of his prosecution as an adult, defendant has strenuously challenged the constitutionality of his exposure to the death penalty. The gravamen of defendant's contention is that the execution of juvenile offenders "has become so arbitrary and freakish" that it constitutes a cruel and unusual punishment prohibited by federal and state constitutional guarantees. *U.S. Const.* amends. VIII, XIV; *N.J. Const. of 1947* art. I, paras. 1 & 12. The trial court rejected defendant's constitutional claims. *Supra* at 55.

We need not address the complex and controversial constitutional question thus posed.[30] In April 1985, subsequent to defendant's conviction, State Senator Russo, sponsor of the 1982 Act reinstating the death penalty, introduced a bill amending the Act to preclude the execution of defendants such as Bey—juvenile offenders tried as adults. The bill proposed instead to subject juvenile offenders convicted of murder to the sentencing provisions of section b, mandating a term of thirty

---

[29]The relevant portion of section c in full reads:

> Any person convicted under subsection a. (1) or (2) who committed the homicidal act by his own conduct or who as an accomplice procured the commission of the offense by payment or promise of payment, of anything of pecuniary value shall be sentenced as provided hereafter * * *

[30]In *Thompson v. Oklahoma*, —— *U.S.* ——, 108 *S.Ct.* 2687, 101 *L.Ed.*2d 702 (1988), the Supreme Court, in a plurality opinion, ruled that the eighth amendment bars the execution of any defendant younger than sixteen-years-old at the time of the offense. Although some of the Court's reasoning is relevant to this case, its holding has no effect on defendant as he was seventeen at the time of the offense.

years to life with 30 years of parole ineligibility.[31] The amendment passed the Senate on June 17, 1985, the Assembly on January 13, 1986, and was signed into law by the Governor on January 17, 1986. *L.*1985, *c.* 478 (codified at *N.J.S.A.* 2C:11–3g). It reads:

> A juvenile who has been tried as an adult and convicted of murder shall not be sentenced pursuant to the provisions of subsection c. but shall be sentenced pursuant to the provisions of section b. of this section. [*Id.*]

In sending the bill to the full Senate, the Judiciary Committee stated:

> The committee adopted an amendment which would clarify that a juvenile tried and convicted of murder as an adult may not be sentenced to death. With regard to this amendment, the committee wished to stress that it was not the intent of the Legislature to have juveniles eligible for capital punishment and that this clarification should be applied to pending cases. [Senate Judiciary Committee, Statement to S–2652 (April 29, 1985).] [32]

---

[31]Section be reads in full:

> Murder is a crime of the first degree but a person convicted of murder shall be sentenced, except as provided in subsection c. of this section, by the court to a term of 30 years, during which the person shall not be eligible for parole or to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.

[32]Senator Russo's initiative apparently had been prompted by the capital-murder prosecution of Willie Smith, in Essex County. See *State v. Smith,* 202 *N.J.Super.* 578 (Law Div.1985). Smith, like Bey, was seventeen at the time of the offense. *Id.* at 581. Before introducing the bill Russo wrote to the Essex County Prosecutor, stating "never once in all these years [of leading the fight to reinstate capital punishment] was it suggested that a juvenile would be subject to this punishment. * * * [A]t best, the entire legislature, like myself, did not intend the law to apply to juveniles. At worst, it simply was not considered." Letter from John Russo to George Schneider (April 26, 1985). A *Star–Ledger* article of April 30, 1985, detailing the bill's progress, quoted Russo as claiming "The death penalty was never meant to apply to juveniles and this legislation will ensure that it never does." *Death Penalty Exemption Gains for Juveniles,* Star–Ledger, April 30, 1985, at 19, col. 1. The article also stated that the committee statement had been suggested by Deputy Attorney General Boris Moczula in order to "make it clear that the exemption for juveniles is intended to apply to anyone already convicted and sentenced to death." *Id.* At the time of these events Marko Bey was the only juvenile offender in New Jersey who had been convicted and sentenced to death.

█ It is clear to us that the Legislature never had intended to subject juvenile offenders to capital punishment, and did intend that its ameliorative amendment would apply retroactively to defendant's case. We are mindful that post-enactment legislative activity and statements should not normally inform the construction and application of a precedent statute, and that our courts "have long followed a general rule of statutory construction that favors prospective application of statutes." *Gibbons v. Gibbons*, 86 *N.J.* 515, 521 (1981). The problem, however, is that

> [w]hether death sentences should be imposed on young offenders is a question that may not occur to legislators until a situation arises to bring it to their attention. Therefore, it would be a mistake to assume that the lack of a statute excluding juveniles from the death penalty indicates an affirmative legislative judgment that juveniles *should* be subject to capital punishment. Legislatures cannot possibly foresee all the diverse situations in which penal statutes could be applied. They can inadvertently prescribe a penalty without realizing the full consequences of their action. [*Hill*, "Can the Death Penalty Be Imposed on Juveniles: The Unanswered Question in *Eddings v. Oklahoma*," 20 *Crim.L. Bull.* 5, 16 (Jan.–Feb. 1984).]

*See Thompson v. Oklahoma, supra,* —— *U.S.* at ——, 108 *S.Ct.* at 2706 (O'Connor, J., concurring). We believe that this explains the unqualified version of section c passed by the Legislature in 1982. Despite the "any person" language and inclusion of age as a mitigating factor, sec. c(5)(c), the statute was passed without any evident consideration of its applicability to juvenile offenders. *See id.* (pointing out absence of evidence indicating that Congress and state legislatures considered the applicability to minors of capital punishment legislation). That the "waiver statute" then in effect, in tandem with section c, would have sanctioned the execution of a fourteen-year-old juvenile offender tried as an adult is further indication that the Legislature did not focus on the application of the death penalty to juveniles. *See N.J.S.A.* 2A:4–48 (1982) (current version at *N.J.S.A.* 2A:4A–26).[33]

---

[33]Indeed, shortly before the death penalty statute received final legislative approval, the Legislature passed a revised waiver statute, *L.*1982, *c.* 77, § 7

The law has historically accorded juveniles differential treatment in many respects, *Eddings v. Oklahoma,* 455 *U.S.* 104, 115–16 & n. 12, 102 *S.Ct.* 869, 877 & n. 12, 71 *L.Ed.*2d 1, 11–12 & n. 12 (1982); *N.J.S.A.* 9:17B–1 (must be eighteen years old to contract, buy, or sell property, marry, etc.), and we cannot lightly presume that the "any person" language was intended to sweep within its purview juveniles tried as adults. *See Cahn v. Allen,* 124 *N.J.L.* 159, 161 (Sup.Ct.1940) (where a statute on its face is applicable to a protected class and application would be inconsistent with pre-existing public policy, court should assume that the Legislature did not intend to abrogate that policy); *cf. Guttenberg Sav. & Loan Ass'n v. Rivera,* 85 *N.J.* 617, 627 (1981) (if legislature intended to modify established property rights, it would do so "in some straightforward manner").

Irrespective of the amendment, the absence of evident legislative consideration would raise serious concerns regarding the validity of the statute's application to defendant. *See AMN, Inc. v. South Brunswick Township Rent Leveling Bd.,* 93 *N.J.* 518, 525 (1983) ("where it is clear that the drafters of a statute did not consider or even contemplate a specific situation," probable intent controls over plain language or "literalisms"); *Guttenberg Sav. & Loan Ass'n v. Rivera, supra,* 85 *N.J.* at 626–27 & n. 4 (court would not find legislative intent to modify mortgagee—sub-tenant relations with landlord-tenant legislation where there was no reference in the Act or at the legislative hearings); *cf. Sheeran v. Nationwide Mut. Ins. Co., Inc.,*

---

(codified at *N.J.S.A.* 2A:4A–26), effective December 31, 1983, that continued the minimum age for waiving juvenile court jurisdiction at fourteen. The State contends that given the short period of time between the passage of these two acts, the Legislature must have realized that juveniles would be exposed to the death sentence. We are not satisfied that the relationship between the two statutes is sufficient to support the State's conclusion. *Cf. Thompson v. Oklahoma, supra,* —— *U.S.* at ——, 108 *S.Ct.* at 2694 n. 24 (waiver statutes do not imply legislatures' views on propriety of capital punishment for minors); *id.* 108 *S.Ct.* at 2706 (O'Connor, J., concurring) (same).

80 *N.J.* 548, 556–57 (1979) (rejecting argument that the legislature did not intend statute to apply to situation *sub judice* by noting that the legislature *had* been made aware of such potential application at the bill's public hearings); *Prejean v. Blackburn,* 570 *F.Supp.* 985, 998 (W.D.La.1983) (legislative intent to subject seventeen-year-old to death penalty found where state *constitution* made seventeen year olds adults for criminal court jurisdiction, eliminating need for waiver), *aff'd,* 743 *F.*2d 1091 (5th Cir.1984).

The imposition of capital punishment can occur only pursuant to an affirmative and conscious decision "by a democratically elected legislature," *Gregg v. Georgia,* 428 *U.S.* 153, 175, 96 *S.Ct.* 2909, 2926, 49 *L.Ed.*2d 859, 876 (1976), and surely not through inadvertence. We reject the State's argument that "it is unimportant" whether the legislature considered the matter so long as its "choice of language" brings the instant facts within the reach of the statute. *See Thompson v. Oklahoma, supra,* —— *U.S.* ——, 108 *S.Ct.* at 2711 (O'Connor, J., concurring) (state cannot, in light of strong evidence of national consensus against such executions, execute defendant who was fifteen at time of offense under facially applicable death penalty statute where "there is considerable risk that the [state] either did not realize that its actions would have the effect of rendering 15–year-old defendant death eligible or did not give the question the serious consideration" that would have underscored an express decision concerning minimum age); *Furman v. Georgia,* 408 *U.S.* 238, 460–61, 92 *S.Ct.* 2726, 2839–40, 33 *L.Ed.*2d 346, 477–78 (1973) (Powell, J., joined by Burger, C.J., and Blackmun and Rehnquist, JJ., dissenting) (eighth amendment cannot bar capital punishment per se for specific categories, but disproportionality analysis could properly preclude death penalty where it "is rendered for a crime technically falling within the legislatively defined class but factually falling outside the likely legislative intent in creating the category"); *State v. Serrone,* 95 *N.J.* 23, 27 (1983) (in sentencing "great deference must be given to the legislative intent"). Certainly in

the context of the death penalty, "a punishment different from all other sanctions in kind rather than degree," *Woodson v. North Carolina*, 428 *U.S.* 280, 303–04, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976), the institutional deference accorded the legislative branch's penological choices by the judicial branch depends on an actual exercise of legislative "judgment." *See Thompson v. Oklahoma, supra,* —— *U.S.* at ——, 108 *S.Ct.* at 2711 (O'Connor, J., concurring) (state cannot execute fifteen-year-old defendant under legislation lacking "the earmarks of careful consideration that we have required for other kinds of decisions leading to the death penalty"); *Coker v. Georgia*, 433 *U.S.* 584, 604, 97 *S.Ct.* 2861, 2872, 53 *L.Ed.*2d 982, 997 (1977) (Burger, C.J., joined by Rehnquist, J., dissenting) (court cannot override *"considered* legislative *judgments"*) (emphasis supplied); *Gregg, supra,* 428 *U.S.* at 175–76, 96 *S.Ct.* at 2926, 49 *L.Ed.*2d at 816 (deference is owed to legislative *judgments* and *decisions*). *But cf. State v. Ramseur*, 106 *N.J.* 123, 178 (Court "assume[s]" Legislature was motivated by "one or more of the well-recognized penological purposes underlying all criminal sanctions"). Failure on our part to insist on *some* indicia of such an exercise would, as stated by *amici,* "authorize death by legislative oversight."

The 1986 amendment and its legislative history plainly confirm the inference one would draw from the silence of the 1982 legislative record concerning juveniles, *i.e.,* "that it was not the intent of the Legislature to have juveniles eligible for capital punishment * * *." *Senate Judiciary Committee Statement, supra* (bill would "clarify" 1982 act); *see State v. Biegenwald,* 106 *N.J.* 13, 63–64 (1987) (amendment accompanied by statement proclaiming to clarify existing statute can provide persuasive evidence of intent behind earlier legislation); *Matawan Borough v. Monmouth County Tax Bd.,* 51 *N.J.* 291, 299 (1968) (amendment "may be resorted to for discovery of legislative intent in the enactment amended"); *State v. Serrone, supra,* 95 *N.J.* at 26 (elimination of phrase "extended term" from statute after conviction helps make clear its meaning as applied to defendant's case). Moreover, we are confident that the Legisla-

ture intended the amendment to operate retroactively and apply to defendant's case; the legislative history detailed above speaks unmistakably of an intent to preclude the execution of *any* juvenile offenders under the 1982 Act. *See Senate Judiciary Committee Statement, supra,* (amendment "would clarify" that juvenile offenders "may not be sentenced to death[;]" "this *clarification should be applied to pending cases*" (emphasis supplied)); *supra* at 97 n. 32 (statements of Sen. Russo) (the amendment will ensure death penalty "never" applies to juveniles). *Compare* Senate Judiciary Committee, Statement to S–950 (November 29, 1984) (proposed amendments to death penalty statute) (passed as *L.*1985, *c.* 178) ("In enacting the amendments contained in this bill, the intent of the Legislature is to effect only prospective changes. The amendments are not intended to apply retrospectively or to affect cases now on appeal.") (discussed in *Biegenwald, supra,* 106 *N.J.* at 64–65 & n. 12).

The function of "curative" or "ameliorative" legislation, such as this amendment, "is to repair the consequences of legal accident or mistake * * * [such as] the failure of the lawmakers to make provision for unforeseen circumstances which should have been provided for * * *." N. Singer, 2 *Sutherland Statutory Construction* § 41.01 at 338 (Sands 4th ed. 1986 rev.) (hereinafter Sutherland). That the Legislature possesses the *power* to prescribe the retroactive application of ameliorative laws cannot be doubted. *See Gibbons v. Gibbons, supra,* 86 *N.J.* at 523 (citing *In re Smigelski,* 30 *N.J.* 513 (1959)); Sutherland, *supra,* § 41.04 at 348–49 (4th ed.1986 rev.) ("no question" of general legislative power to enact retroactive laws). To be sure, such power is constitutionally constrained, but the juvenile exemption does not impose a new criminal liability or a punishment of increased severity. Thus retroactive application will not run afoul of federal and state constitutional guarantees prohibiting "ex post facto laws." *U.S. Const.* art. I, § 10, cl. 1; *N.J. Const. of 1947* art. IV, § VII, para. 3; *see Matter of Coruzzi,* 95 *N.J.* 557, 577–78 (1984) ("essence of

the[se] prohibitions is to forbid states to enact any law that imposes a punishment for an act that was not punishable at the time committed, or that imposes additional punishment to that then described").

Further, the presumption against retroactive application "is no more than a rule of statutory interpretation," *Rothman v. Rothman*, 65 *N.J.* 219, 224 (1974), and can be overcome by an indication of contrary legislative intent, either expressed in the language of the statute itself, or implied in its purpose. *Gibbons v. Gibbons, supra*, 86 *N.J.* at 522. Where, as here, such an indication is present, it is "well-established * * * that an appellate court on direct review will apply the statute in effect at the time of its decision * * * [so as] to effectuate the current policy declared by the legislative body * * *." *Kruvant v. Mayor & Council, Township of Cedar Grove*, 82 *N.J.* 435, 440 (1980); *accord New Jersey v. Ventron Corp.*, 94 *N.J.* 473, 498 (1983) ("when the Legislature has clearly indicated that a statute should be given retroactive effect, the courts will give it that effect unless it will violate the constitution or result in a manifest injustice").

The State contends the amendment cannot operate retroactively because the text itself does not expressly mandate as much. The prospective application "rule," however, is only a general guide, and "is not to be applied mechanistically to every case." *Gibbons v. Gibbons, supra*, 86 *N.J.* at 522. At all times "primary regard must be given to [a statute's] fundamental purpose," and if need be, "the spirit of the law will control the letter." *N.J. Builder's, Owners, and Managers Ass'n v. Blair*, 60 *N.J.* 330, 338 (1972); *see Piscataway Township Bd. of Educ. v. Caffiero*, 86 *N.J.* 308, 316–17 & n. 6 (1981); *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 160 (1979). Moreover, the text of the amendment alone, when contrasted with other provisions of *N.J.S.A.* 2C:11-3, can be read to warrant retroactive application. Whereas the murder statute's other two sentencing provisions speak simply of "person convicted,"

sec. b, c, the juvenile exemption amendment applies to a "juvenile who *has been* tried as an adult and convicted * * *." Sec. g (emphasis supplied). Additionally, the "has been" phraseology differs markedly from the Legislature's amendment to section e, passed at the same time as section g, which speaks in the present tense; *i.e.*, applying whenever "the defendant fails, or refuses to appeal * * *." *L.*1985, *c.* 478, § 1. An ameliorative statute made applicable to someone who "has been tried * * * and convicted" may logically extend to convictions preceding its enactment, especially in light of the aforementioned distinctions from other provisions.[34]

In any event, at the same time the State presses this text-based argument, it concedes the legislative purpose was to enact retroactive legislation and that defendant's case is "pending" in the sense contemplated by the Committee Statement (" * * * this clarification should be applied to pending cases"). As stated above, we find the Legislature's intent regarding retroactivity unequivocal, and hence will give it full effect. *New Jersey v. Ventron Corp., supra,* 94 *N.J.* at 478; *Kruvant v. Cedar Grove, supra,* 82 *N.J.* at 440; *New Jersey Builders v. Blair, supra,* 60 *N.J.* at 338. Accordingly, we hold section g applicable to defendant's case; hence, if retried and convicted of murder, he may be sentenced only pursuant to section b.

We add as a final note that apart from the Legislature's intent concerning retroactivity, notions of fundamental fairness, invoked by this Court in *State v. Biegenwald, supra,* 106 *N.J.* 13, 65–67, to order the retroactive application of a burden-of-proof amendment to section c, would likewise demand retroactive application of the juvenile-offender exemption in this case. Indeed, the Attorney General has vigorously challenged defendant's sentencing-related constitutional and statutory arguments, but concedes that "sound public policy and fundamen-

---

[34]At the very least, the insertion of "has been * * * " would render the text ambiguous with respect to retroactive application, making resort to the legislative history appropriate under any rule of statutory construction.

tal fairness dictate that defendant not be singled out to be the only juvenile ever executed or even eligible for execution under our current death penalty law."

Defendant's convictions are reversed, and the matter is remanded to the Law Division for proceedings not inconsistent with this opinion.[35]

HANDLER, J., concurring.

In this case defendant was convicted of capital murder and sentenced to death. The Court now reverses defendant's conviction and death sentence, holding that his confession was improperly admitted in violation of his fifth amendment and state-law privilege against self-incrimination and that his state and federal constitutional rights to trial by a fair and impartial jury were violated as a result of prejudicial publicity. The Court also holds that the death penalty cannot be applied to the defendant as a juvenile offender.

I concur in the reasoning and result expressed by the Court's opinion. I write separately, however, to explain more completely the importance of understanding and applying an enhanced standard of appellate review to capital cases, a principle that the majority, at least in part, follows in the instant case. This Court had previously expressed its willingness to conduct a more stringent review of the record in capital cases than is required in other criminal appeals, *State v. Ramseur*, 106 *N.J.* 123, 324 n. 84 (1987). Nevertheless, neither in *Ramseur* itself nor in *State v. Biegenwald*, 106 *N.J.* 13 (1987) did the Court either make clear what such a heightened standard would entail or actually conduct a different review than it would have undertaken in any other case.

Nor is the application of a different standard of review evident in the decision that accompanies this case, *State v. Bey (II)*, 112 *N.J.* 123 (1988). Indeed, the failure to follow and

---

[35]In view of this resolution the Court need not address defendant's further claims concerning his convictions and the death penalty statute.

apply this enhanced standard in *Bey (II)*, while invoking a heightened review of the record in this case, presents, in my opinion, an incongruous comparison. The majority today professes to apply a standard of review in capital cases that is "meticulous and searching" but eschews the suggestion that the standard should be further defined and modified. *Ante* at 91–94. This reluctance should yield, however, in light of the constitutional principles that must be vindicated, and the greater consistency to be realized in the resolution of capital cases. Hence, the debate, it seems to me, should be about what the standard is or should be, not about whether the standard should exist. This belief impels me to attempt to elaborate the standard of review that must be applied in capital-murder prosecutions. I do so, not minimizing my agreement with the Court on the essential issues of this case.

I.

The foundations for an enhanced standard of appellate review in capital cases have been laid in the United States Supreme Court's repeated recognition that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny...." *California v. Ramos*, 463 *U.S.* 992, 998–99, 103 *S.Ct.* 3446, 3452, 77 *L.Ed.*2d 1171, 1179 (1983); *see Caldwell v. Mississippi*, 472 *U.S.* 320, 329, 105 *S.Ct.* 2633, 2639, 86 *L.Ed.*2d 231, 239 (1985) (per Marshall, J.); *Eddings v. Oklahoma*, 455 *U.S.* 104, 117–118, 102 *S.Ct.* 869, 878–879, 71 *L.Ed.*2d 1 (1982) (O'Connor, J., concurring); *Beck v. Alabama, supra,* 447 *U.S.* 625, 637–638, 100 *S.Ct.* 2382, 2389–2390, 65 *L.Ed.*2d 392, 402–03 (1980) (per Stevens, J.); *Lockett v. Ohio*, 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964, 57 *L.Ed.*2d 973, 989 (1978) (per Burger, C.J.); *Gardner v. Florida*, 430 *U.S.* 349, 357–358, 97 *S.Ct.* 1197, 1204–1205, 51 *L.Ed.*2d 393, 401–02 (1977) (per Stevens, J.); *id.* at 363–364, 97 *S.Ct.* at 1207–1208, 51 *L.Ed.*2d 393, 405–06 (White, J., concurring in judgment); *Woodson v. North Carolina*, 428 *U.S.* 280, 305, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

Many states have acknowledged their special appellate role in capital cases by statutory provisions or judicial decisions that mandate exacting review of capital murder appeals.[1] States have responded to this imperative by providing for independent appellate review of the imposition of the death penalty, *e.g.*, *Lewis, Harding, Brogdon*, and by requiring review of the jury's finding that an aggravating circumstance existed, *e.g.*, *State v. Fetterly*, 109 *Idaho* 766, 710 *P.*2d 1202, 1208 (1985), *cert.* denied, 479 *U.S.* 870, 107 *S.Ct.* 239, 93 *L.Ed.*2d 164 (1986); *Coleman v. State*, 185 *Mont.* 299, 605 *P.*2d 1000, 1019 (1979), *cert.* denied, 446 *U.S.* 970, 100 *S.Ct.* 2952, 64 *L.Ed.*2d 831

---

[1]Many states require the reviewing court not only to make fact findings independent of the sentencing courts, but also to conduct an independent weighing of aggravating and mitigating circumstances to verify the propriety of a given death sentence. *See, e.g.*, Colo.Rev.Stat. § 16–11–103(7)(a) (Supreme Court "shall review the propriety of [any death] sentence, having regard to the nature of the offense, the character and record of the offender, the public interest, and the manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based"); Ohio Code Supp. § 2929.05 (Ohio Supreme Court "shall *review and independently weigh* all of the facts and other evidence disclosed in the record ..." in assessing the propriety of a death sentence) (emphasis added). Thus, in Alabama, the Court of Criminal Appeals "must *independently weigh* the aggravating and mitigating circumstances to determine whether they are sufficient to support a sentence of death." *Lewis v. State,* 380 *So.*2d 970, 977 (Ala.Crim. App.1979) (emphasis added); *see also State v. Harding,* 137 *Ariz.* 278, 670 *P.*2d 383, 398 (1983), *cert.* denied, 465 *U.S.* 1013, 104 *S.Ct.* 1017, 79 *L.Ed.*2d 246 (1984) (Arizona Court must conduct independent review of the record of each capital case "to determine the correctness of the findings of the trial court as to aggravating and mitigating circumstances, in order to *independently determine the propriety of the sentence imposed*") (emphasis added).

The Louisiana Supreme Court has promulgated a Court Rule specifying its standard of review in death penalty cases, providing that, in determining whether a given capital sentence is excessive, the court shall determine

(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; (b) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

[*State v. Brogdon,* 457 *So.*2d 616, 630 (La.1984), *cert.* denied, 471 *U.S.* 1111, 105 *S.Ct.* 2345, 85 *L.Ed.*2d 862 (1985) (citing La.Sup.Ct.Rule XXVIII).]

(1980); *Foster v. State,* 714 *P.*2d 1031, 1041 (Okla.Cr.App.), *cert.* denied, 479 *U.S.* 873, 107 *S.Ct.* 249, 93 *L.Ed.*2d 173 (1986); *Hopkinson v. State,* 664 *P.*2d 43, 86 (Wyo.1983), *cert.* denied, 464 *U.S.* 908, 104 S.Ct. 262, 78 *L.Ed.*2d 246 (1983). Most important, an enhanced standard of review has been applied to guilt-phase errors in capital murder appeals. *See, e.g., Fisher v. State,* 481 *So.*2d 203 (Miss.1985); *Weeks v. State,* 456 *So.*2d 395 (Ala.Cr.App.1983), aff'd 456 *So.*2d 404 (Ala.1984), *cert.* denied, 471 *U.S.* 1030, 105 *S.Ct.* 2051, 85 *L.Ed.*2d 324 (1985); *Commonwealth v. Zettlemoyer,* 500 *Pa.* 16, 454 *A.*2d 937 (1982), *cert.* denied, 463 *U.S.* 1236, 104 *S.Ct.* 31, 77 *L.Ed.*2d 1452 (1983); *State v. Wood,* 648 *P.*2d 71 (Utah), *cert.* denied, 459 *U.S.* 988, 103 *S.Ct.* 341, 74 *L.Ed.*2d 383 (1982).

Application of an enhanced standard of appellate review by this Court would be consistent with these other jurisdictions and with the federal court's recognition of the special role that state appellate courts must fill. Moreover, the enhanced standard of appellate review comports with the statutory scheme enacted by this State's Legislature in reinstating capital punishment and with principles expounded (if not results reached) in decisions of this Court.

This State's capital murder statute reflects the special nature of the death penalty in its provision of protections not available to other criminal defendants. The statute differentiates death penalty prosecutions from other criminal prosecutions by requiring that convicted capital offenders be given a right of direct appeal to this Court. *N.J.S.A.* 2C:11–3e. The distinctive statutory sentencing scheme uses a jury to weigh aggravating and mitigating factors as the method for imposing a death sentence, thus separating capital murder sentencing from all other criminal sentencing. *N.J.S.A.* 2C:11–3c(1). The standards governing admissibility of mitigating evidence, moreover, are extremely liberal while those relating to the aggravating factors remain strict. *N.J.S.A.* 2C:11–3c(1), amended *L.*1985, *c.* 178, § 2. The statute further specifically allows for three possible penalty phase verdicts by stating that non-unanimity is

a legitimate determination and requires a non-death sentence. *N.J.S.A.* 2C:11–3c(3). *See State v. Bey (II), supra,* 112 *N.J.* at 158; *State v. Ramseur,* 106 *N.J.* at 311–15. Moreover, the Legislature amended the capital murder statute to exclude juveniles from the death penalty even though they can be tried as adults and subjected to any other criminal punishment. *N.J.S.A.* 2C:11–3g; *ante* at 96–99. Further, the legislative understanding that heightened protections were required for a capital murder prosecution is reflected by the statement of the bill's sponsor, Senator John Russo:

> But, the bill has some rather rigorous provisions in it for the protection of the defendant, the theory being that ultimate penalty is paid, as difficult as that will be on all of us who have a part in it, when that day comes, we want to at least feel we have tried to cover every possible contingency for the protection of the defendant and hopefully it will be utilized only in the most extreme cases.
>
> [Public Hearing, N.J. Senate Judiciary Committee, Senate No. 112, at 1 (Feb. 26, 1982).]

This evolving understanding of the important ramifications of capital causes is also reflected directly and indirectly in our own decisions. In *State v. McCrary,* 97 *N.J.* 132, 144 (1984), we held that the State must serve a notice of aggravating factors on defendant prior to trial and that the defendant must be afforded the opportunity to challenge these factors in a pretrial motion. The Court went beyond the dictates of the statute to require this limited judicial review of the prosecutor's discretion because "[w]hen a criminal proceeding takes on the character of a capital case, the exercise of such authority is not only tenable, it is absolutely imperative to ensure fundamental fairness to a defendant." *Id.* at 139. Similarly, in *State v. Davis,* 96 *N.J.* 611 (1984), this Court held that a lower standard of admissibility must apply to defendant's proffer of evidence concerning mitigating factors "[b]ecause of this fundamental distinction between the death penalty and all other punishments." *Id.* at 622. We also determined, in *State v. Koedatich, supra,* 98 *N.J.* 553 (1984), that a defendant could not waive his statutory right to direct appeal. The Legislature expressed its approval for these augmented protections by amending the

statute in 1985 to conform with the Court's opinion in *Davis* and *Koedatich.* *L.* 1985, *c.* 178, § 2; *L.*1985, *c.* 478, § 1.

This Court, moreover, has a special role in capital murder prosecutions; it must function as the final fail-safe. It is importuned, through its conduct of proportionality review, to ensure that the death penalty is, as Senator Russo put it, "utilized only in the most extreme cases." *See N.J.S.A.* 2C:11–3e. In ensuring that only these "most extreme" cases are selected, a comprehensive standard for appellate supervision and review of the record below, one enhanced substantially beyond that customarily applicable in ordinary criminal causes, is essential.

Like courts in other states, this Court should, as a consequence of the direct appeal posture of death penalty cases and the mandate of proportionality review, conduct an independent and searching review of the record below. This Court, in capital cases, is reviewing the raw material of the trial itself, and not a record that has been refined on appeal; our review of that record therefore must necessarily be of a different, more searching, nature. A critical and independent examination of the entire record made at the trial level is required. Consequently, the standard of review for capital causes counsels for less, not more or even customary, deference to the trial court's factual determinations. *Cf. State v. Ramseur, supra,* 106 *N.J.* at 260 (deference to trial court's determinations on jury *voir dire* in capital murder prosecution); *State v. Biegenwald, supra,* 106 *N.J.* at 29–30 (same). This review of the record must be plenary, because the jury's penalty-phase determination is undeniably influenced by the guilt-phase proceedings, the record of which is routinely moved into evidence at the beginning of the penalty phase and becomes an integral part of the record in the penalty determination.

The enhanced standard of review requires the Court to engage in a scrupulous and meticulous review of the record on appeal, including all findings of fact and rulings by the trial

court. Once this review is completed, the question becomes what substantive standard of reversibility should guide appellate review. In my opinion, this enhanced review of the record must be complemented by a rigorous substantive standard for determining whether errors adduced from this searching review are reversible. A review of the application of the substantive standards in cases before this Court and the United States Supreme Court exposes, in my opinion, the need for a fully defined substantive standard of review in death penalty appeals.

This Court has recognized the principle that death is a unique sanction requiring uncommon procedural protections. *State v. Ramseur, supra,* 106 *N.J.* at 324; *State v. Williams,* 93 *N.J.* 39, 61 (1983). The commitment to an enhanced standard of review for capital cases and a recognition that capital prosecutions are fundamentally different from any other prosecutions was expressed in *State v. Williams, supra,* by this Court when it stated:

> This requirement of fairness—and particularly jury impartiality—is heightened in cases in which the defendant faces death. The death penalty is a categorical imperative for trial fairness.
>
> [93 *N.J.* at 61.]

The nature and scope of the Court's commitment to a heightened standard, however, remains unclear. In *State v. Ramseur,* the majority endorsed in principle a heightened scrutiny of the record with respect to prosecutor's actions in death penalty prosecutions, stating:

> Because death is a uniquely harsh sanction this Court of necessity will more readily find prejudice resulting from prosecutorial misconduct in a capital case than in other criminal matters.
>
> [106 *N.J.* at 324.]

Similarly, in *Biegenwald,* this Court reiterated its commitment to "scrupulously review" prosecutorial conduct in capital cases, 106 *N.J.* at 40. In both cases, however, the Court failed to explain the standard it proposed to adopt and the results it reached. Moreover, its dispositions did not reflect the heightened scrutiny it claimed to have undertaken. The Court de-

ferred, in fact, in several respects to the trial court's findings instead of independently verifying such lower court determinations. *See Ramseur,* 106 *N.J.* at 260; *Biegenwald,* 106 *N.J.* at 29–30.

If this Court's standard of substantive review remains undefined, the federal Court's efforts to derive a consistent standard of review to embody the principle that "death is different" have been confusing and inconsistent, if not incoherent. In *Caldwell v. Mississippi, supra,* the Court reversed a capital sentence because of prosecutorial comments that "sought to minimize the jury's sense of responsibility for determining the appropriateness of death made during the penalty phase," 472 *U.S.* at 341, 105 *S.Ct.* at 2646, 86 *L.Ed.*2d at 247. The Court identified its criterion of review as follows: "Because we cannot say that this effort had *no effect on the sentencing decision,* that decision does not meet the standard of reliability that the Eighth Amendment requires." *Id.* (emphasis added). A similar stringency was exhibited in the recent case of *Gray v. Mississippi,* 481 *U.S.* 648, 107 *S.Ct.* 2045, 95 *L.Ed.*2d 622 (1987), in which a plurality of the Court declared that the erroneous exclusion for cause of a death-scrupled juror is not amenable to harmless error analysis. "[T]he relevant inquiry," the Court held, is "whether the composition of the *jury panel as a whole* could possibly have been affected by the trial court's error." *Id.* at ——, 107 *S.Ct.* at 2055, 95 *L.Ed.*2d at 637 quoting *Moore v. Estelle,* 670 *F.*2d 56, 58 (5th Cir.) (specially concurring opinion), *cert.* denied, 458 *U.S.* 1111, 102 *S.Ct.* 3495, 73 *L.Ed.*2d 1375 (1982) (emphasis in original); *see also Mills v. Maryland,* —— *U.S.* ——, 108 *S.Ct.* 1860, 100 *L.Ed.*2d 384 (1988) (vacating death sentence because of "substantial possibility" that jury believed, from court's instructions, that it had to be unanimous on mitigating factors; no showing of actual prejudice was required).

The federal Court in subsequent cases has not, however, endorsed either the stringent "no effect" standard applied in *Caldwell* or the "possible effect" standard of *Gray.* In *Darden v. Wainwright,* 477 *U.S.* 168, 106 *S.Ct.* 2464, 91 *L.Ed.*2d

144 (1986), the Court, in a 5-to-4 decision, explicitly rejected application of the *Caldwell* "no-effect" standard to reverse a capital sentence because of improper prosecutorial comments during the guilt phase limiting *Caldwell* to comments "that mislead the jury as to its role in the sentencing process...." *Id.* at 183 n. 15, 106 *S.Ct.* at 2473 n. 15, 91 *L.Ed.*2d at 158–59 n. 15. The Court believed that *Caldwell* could be satisfactorily distinguished because "[t]he comments in *Caldwell* were made at the sentencing phase of trial and were approved by the trial judge. In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing." *Id.*

Justice Blackmun, joined in dissent by Justices Brennan, Marshall, and Stevens, argued persuasively, however, that *Caldwell* was not so easily distinguishable. The *Darden* dissent relied on the seven-member majority's opinion in *Beck v. Alabama, supra,* in which the Court stated: "To insure that the death penalty is ... imposed on the basis of 'reason rather than caprice or emotion,' we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. *The same reasoning must apply to rules that diminish the reliability of the guilt determination.*" 447 *U.S.* at 638, 100 *S.Ct.* at 2390, 65 *L.Ed.*2d at 403 (emphasis added). From this principle, the dissent reasoned that the *Caldwell* no-effect standard should be applicable to the prosecutorial comments at issue in *Darden* because:

> *Caldwell's* Eighth Amendment underpinnings clearly extend to guilt determinations in capital cases as well as to sentencing.... And under the circumstances of this case, where the sentencing hearing followed immediately upon the jury's return of a guilty phase and the State's summation consisted of less than a full page of transcript ... I think the State must have assumed that its ... repeatedly expressed wish that Darden die would affect the jury's sentencing decision as well as its determination of guilt.
>
> [477 *U.S.* at 177 n. 3, 106 *S.Ct.* at 2470 n. 3, 91 *L.Ed.*2d at 167 n. 3 (citations omitted).]

In line with its restrictive review in *Darden,* the Court in *Ross v. Oklahoma,* —— *U.S.* ——, 108 *S.Ct.* 2273, 101 *L.Ed.*2d 80 (1988), held by a 5-to-4 margin that a trial court's

erroneous failure to exclude a juror because of pro-death penalty bias was harmless, despite the fact that the defense was forced to exercise a peremptory challenge and ultimately exhausted its peremptory challenges. In so holding, the Court rejected the *Gray* Court's "possible effect" test: "We think the broad language used by the Gray Court is too sweeping to be applied literally and is best understood in the context of the facts there involved." *Id.* 108 *S.Ct.* at 2278. The Court did not indicate what its exact standard of review consisted of but instead looked to whether the jury that actually sat was impartial, ignoring case law holding that "[t]he denial or impairment of the right [to a full complement of peremptory challenges] is reversible error without a showing of prejudice." *Swain v. Alabama*, 380 *U.S.* 202, 219, 85 *S.Ct.* 824, 835, 13 *L.Ed.*2d 759, 772 (1965).

The confusion over the proper substantive standard of review to be applied in death penalty cases was crystallized in the recent case of *Satterwhite v. Texas,* —— *U.S.* ——, 108 *S.Ct.* 1792, 100 *L.Ed.*2d 284 (1988). In *Satterwhite,* the Court held that the admission of a psychiatrist's report on future dangerousness during the penalty phase of a capital case violated the Sixth Amendment where defense counsel was given no advance notice of the examination. *Id.* at ——, 108 *S.Ct.* at 1796. More important than this determination, however, was the Court's decision that this constitutional error was subject to harmless error analysis under *Chapman v. California,* 386 *U.S.* 18, 24, 87 *S.Ct.* 824, 828, 17 *L.Ed.*2d 705, 710–11 (1967). The majority reversed the lower court determination that the error was harmless, holding that the "sufficiency of evidence" standard of review below was inadequate: "The question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Satterwhite v. Texas, supra,* —— *U.S.* at ——, 108 *S.Ct.* at 1798 (quoting *Chapman, supra,* 386 *U.S.* at

24, 87 *S.Ct.* at 827, 17 *L.Ed.*2d at 710). Thus, the majority interjected a possible third standard of review for capital cases; that is whether the. error "contributed to the verdict." In concurrence, Justice Marshall, joined by Brennan and Blackmun, reasoned that

[t]he threat of an erroneous harmless-error determination ... looms much larger in the capital sentencing context than elsewhere.... Because of the moral character of a capital sentencing determination and the substantial discretion placed in the hands of the sentencer, predicting the reaction of a sentencer to a proceeding untainted by constitutional error on the basis of a cold record is a dangerously speculative enterprise.

[*Satterwhite v. Texas, supra,* —— *U.S.* at ——, 108 *S.Ct.* at 1800.]

Justice Marshall reasoned that harmless error is an inappropriate standard in a capital sentencing context, because "[u]nlike the determination of guilt or innocence, which turns largely on an evaluation of objective facts, the question whether death is the appropriate sentence requires a profoundly moral evaluation...." *Id.*

It is clear, therefore, from this Court's failure and the Supreme Court's inability to define a uniform substantive standard of review for death penalty cases, that until such a standard is defined and applied consistently, the results of various appeals will be irreconcilable, as *Caldwell* is with *Darden, Gray* is with *Ross,* and *Bey (I)* is with *Bey (II).* It has become a matter of some urgency to explicate more fully the standard of "heightened review" that even the *Ramseur* majority agreed should exist in capital cases. I offer the following analysis as a stimulus to further thought.

I commend, initially, the concurring opinion in *Satterwhite.* Because the capital sentencing decision is intrinsically a moral, rather than exclusively an evidentiary, decision, harmless error is an inadequate standard in the context of a capital murder prosecution. This insight applies with equal force, in my opinion, to the jury's guilt-phase determinations, for the reasons identified in *Beck v. Alabama, supra,* and the dissent in *Darden v. Wainwright, supra;* because the guilt-phase record is routinely moved into evidence as the foundation of the penalty-phase judgment, any distinction between the two phases disin-

tegrates. A capital case is a prosecutorial continuum in which evidence moves without interruption or alteration from the trial of guilt and the determination of death eligibility to the trial of penalty and the imposition of sentence. A guilt-phase determination in a capital case differs in kind, therefore, from a guilt determination in the normal criminal case. To avoid the confusion that could easily arise, I believe that harmless error should be eschewed as a substantive standard of appellate review of error in death penalty cases.

The standard of review governing capital cases should embrace elements that can serve both to direct and to quantify the determination of reversibility. I believe the basic standard of reversibility must reflect the moral implications that pervade a capital proceeding from beginning to end, while taking into account pragmatic considerations relating to the administration of criminal justice. This standard of review, in other words, must be rigorous and escalated well beyond that which is customarily employed; at the same time, however, it should not blindly nullify everything essayed in the prosecution under review.

Accordingly, the State should be required to show beyond a reasonable doubt where the error is not of constitutional dimension, that there was no realistic likelihood of prejudice affecting the jury's deliberations arising from the error. Absent that demonstration, the error must lead to a reversal. Where the error is of constitutional dimension, however, this Court should be guided by the *Caldwell* "no effect" standard; the substantive test must be further elevated to protect against the consequences of constitutional error. The State shall be required to show that a constitutional error, whether arising in a pre-penalty phase of the prosecution or in the penalty phase itself, had "no effect" on the determination to impose the death sentence. This is a difficult, though not impossible, standard to meet, but an appropriate one, in my view, for errors of constitutional magnitude in death penalty proceedings.

The enhanced standard of review in capital cases entails, therefore, a two-step analysis in first identifying and then analyzing errors. First, the reviewing court must exercise heightened scrutiny of the record and independence in making its own findings with respect to trial court rulings and determinations. Once errors are identified through this heightened scrutiny, the second process requires an in-depth assessment of all errors comprehending every phase of the prosecution under the substantive standard derived above from federal and state constitutional sources.

Each step in this review process involves a departure from the norms of appellate review. The heightened scrutiny of the record, the first predicate of this enhanced standard of review of capital causes, requires a more rigorous methodology, approach and attitude toward judicial review in relation to the record below. This scrutiny derives from the procedural posture of the case as a direct appeal, and from the mandate of proportionality review. The second, and key, feature of the enhanced standard of review, the requirement of a different, clarified, and more stringent substantive test for determining reversible error, derives ultimately from our understanding that courts are subject to a categorical imperative for assuring fairness in the judicial administration of capital causes. *State v. Williams, supra.* The standard thus does not require the defendant to demonstrate that the error resulted in any prejudicial impact; rather, it enjoins the State to demonstrate beyond a reasonable doubt, when it wishes to take life, the absence of any realistic likelihood that an error committed in gaining a death sentence prejudiced the jury's deliberations, and, with respect to constitutional errors, the absence of any effect whatsoever on the jury's deliberations.

The two components of the standard are unified in their scope; each encompasses all phases of a capital murder prosecution, including the accusatory, pretrial, and trial stages of the prosecution. I believe that any distinction between guilt and penalty phases for purposes of either prong of the two-part test

for appellate review is inconsistent with the reasoning of *Beck v. Alabama, supra.* Moreover, it would be particularly anomalous in New Jersey, where both phases are heard successively on largely overlapping evidence before the same jury and where, as the Court has acknowledged, the aggravating factors considered by the jury during the sentencing phase "are functionally indistinguishable," because of the breadth of the guilt-phase definition of capital murder, "from elements of the offense." *Ramseur,* 106 *N.J.* at 201 n. 27; *Biegenwald,* 106 *N.J.* at 59 (noting the "functional similarity" of aggravating factors and elements of an offense).

Both the State and this Court have an overarching responsibility in assuring the fair and rational application of the death penalty. *See State v. Koedatich,* 98 *N.J.* 553 (1984). Because this responsibility demands an independent and exhaustive review of the record, the errors contemplated by this standard should not be limited by the species of error claimed, such as prosecutorial comments. The substantive standard must be applied, moreover, to all errors that are presented on appeal, whether or not the subject of an objection at the trial or raised for the first time by defendant on appeal or noted by the Court itself. The reversibility of error may not turn on whether it was acquiesced in or caused by the defense counsel at the trial level. *Cf. State v. Harper,* 128 *N.J.Super.* 270, 277 (App.Div.), certif. den., 65 *N.J.* 574 (1974) (appellate court can disregard errors caused by defendant unless they impair fundamental right to fair trial). Thus, the heightened scrutiny of the record, acting in combination with the stringent standard for reversibility, eliminates less protective tests for determining reversible error, such as "plain error" and "harmless error."

A principal virtue of this two-pronged test is that by combining a thorough-going review of the record with a stringent substantive standard, it requires the appellate court to see the case as a whole. Thus, each error identified in the Court's analysis of the record is critically evaluated in assessing prejudice both for its individual effect on deliberations and for its

effect on the structure of the entire case. Issues such as the ameliorative effect of curative instructions, or the deleterious effect of publicity, will thus depend in part on such normally less important factors as the nature and strength of the proofs and the nature and degree of other errors.

The enhanced standard of review imposes a substantial burden on the State, but imposes it because death is a unique and irreversible sanction. The standard of appellate review applicable to death penalty cases cannot accommodate the room for error that is tolerable in cases where life is not at stake. The imperative for fairness demands that the margin of mistake be diminished where the effect of an error would be irremediable. It is not perfection that is prescribed; rather, it is a level of error-free process that is commensurate with the criminal sanction of death. It should thus be appreciated that this enhanced standard is unique to capital causes. This special standard need not, therefore, and indeed should not, be applicable to non-capital criminal prosecutions. The jurisprudence governing capital murder is truly distinctive; an overriding goal of our jurisprudence should be to require death penalty law to develop to the extent possible without influencing or distorting the settled law governing the general administration of criminal justice.

A different standard of review, in sum, governs the appellate disposition of capital causes; this standard of review is unique in both its substantive and procedural aspects, and is materially more protective, as a consequence of the severity of the penalty, than that applicable to the generality of criminal appeals. To be applied consistently, this standard must be expressly defined, consciously followed, and uniformly invoked as to all errors on appeal.

## II.

The Court's willingness to apply the first part of this enhanced standard of review in this case is evidenced by its

disposition, reflecting an actual independent and exacting scrutiny of the record, concerning the confession and the midtrial publicity issues.

## A.

The Court rules that defendant's confessions relating to the Alston murder were obtained in violation of his fifth amendment and state-law privileges against self-incrimination. The Court observes that when the police officer began to question defendant about the Alston incident, he immediately invoked his right to remain silent by "[indicating] he did not want to talk to us about it...." *Ante* at 64.

The Court properly recognizes that the right of a suspect to remain silent during the course of custodial interrogation is one guaranteed by both the federal fifth amendment, *see, e.g., Miranda v. Arizona,* 384 *U.S.* 436, 460–61, 467, 86 *S.Ct.* 1602, 1624, 16 *L.Ed.*2d 694, 715–16, 719 (1966); *Michigan v. Mosley,* 423 *U.S.* 96, 103, 96 *S.Ct.* 321, 326, 46 *L.Ed.*2d 313, 321 (1975), and state law, *State v. Hartley,* 103 *N.J.* 252, 260, 262–63, 284–86 (1986). It also recognizes that continued police interrogation, rather than the immediate termination of interrogation, after a defendant has invoked his right to remain silent will render any subsequent inculpatory statements unconstitutionally compelled as a matter of law, and hence inadmissible. *Ante* at 68–73.

I agree emphatically with this Court's analysis and conclusion, and can express only consternation that the Court did not undertake the same searching analysis in the companion case of *Bey II.* I see no legally significant distinction between defendant's expression in this case that "he would have nothing to say" and his expression in *Bey II,* occurring earlier in the ongoing interrogation, that "he wanted to think about it." Each constitutes a request by the defendant to invoke his right to remain silent because, as the majority stresses, a request to terminate interrogation "however ambiguous" must be scrupu-

lously honored. *Ante* at 64 (citing *State v. Kennedy,* 97 *N.J.* 278, 288 (1984); *State v. Wright,* 97 *N.J.* 113, 119–20 (1984); *State v. McCloskey,* 90 *N.J.* 18, 26 n. 1 (1982)). The only explanation I can offer for this incongruous difference in result is that the Court in *Bey (II)* has not engaged in the *same* heightened scrutiny of the *same* record, and has applied at most an ordinary standard for determining the reversibility of error.

### B.

The Court has determined, correctly in my view, that the trial court's efforts to deal with the midtrial publicity were inadequate and that the resulting prejudice mandates a reversal of defendant's conviction. *Ante* at 81, 91. The Court states:

> We believe the court erred in relying on its protective instructions alone, and conclude that due to the highly prejudicial nature of the information contained in these articles, and the realistic possibility that it may have reached one or more of the jurors, the court's refusal to poll the jury violated defendant's fair trial rights and requires that his convictions be reversed.
>
> [*Ante* at 81.]

I concur in the Court's determination that the trial court failed to safeguard defendant from a jury untainted by extraneous prejudicial publicity. As pointed out by the Court, the trial court refused throughout to question the jurors individually or to poll the jury generally concerning the articles at issue. The court also refused to sequester the jury until the final night of the penalty phase. *Ante* at 56–57. As the majority correctly holds, in light of the circumstances the trial court's refusal to poll the jury constitutes reversible error. Most important, it is the enhanced scrutiny of the record and the trial court's rulings that lead the majority to conclude under a conventional standard of review for error that the trial court committed reversible error in failing adequately to shield the jury from exposure to that publicity.

The Court now adopts and follows the majority rule in dealing with prejudicial midtrial publicity. This approach,

which carries forward to the trial stage the degree of scrutiny mandated by *State v. Williams, supra*, to combat the potential for prejudice resulting from publicity that may affect the selection of jurors, should ensure that the jury will be free from the taint of publicity when it considers the evidence against a defendant. Under *Williams*, the trial court must conduct especially searching *voir dire* and consider the need for a change of venue in the event of extensive pretrial publicity that presents the realistic likelihood of prejudice. 93 *N.J.* at 67–69. The majority's opinion, consistent with *Williams*, requires that trial courts exercise the same vigilance to protect jurors from the taint of midtrial publicity.

The majority's opinion reinforces this Court's commitment to a jury free from tainted publicity by requiring that the court undertake effective measures to ascertain whether during the trial jurors were exposed to such information. *See ante* at 86–90. Thus, in conjunction with *Williams*, this Court has provided that trial courts must undertake to eliminate any potential for prejudice resulting from pretrial or midtrial publicity in a capital murder prosecution, requiring in effect enhanced procedural protections guaranteed by an enhanced scrutiny of the trial court's rulings.

### III.

I find myself in basic agreement with the opinion of the Court in terms of its meritorious determinations of the major controverted issues on this appeal. I concur particularly in the Court's disposition of the confession and trial publicity issues. I am satisfied that the Court's treatment of the record on this appeal is fully consistent with one aspect of the enhanced standard of review, namely, heightened scrutiny of the record. I express my concurrence in the belief and hope that the Court will continue to apply this heightened scrutiny conscientiously, will consciously invoke a comprehensive enhanced standard of review, and will adopt a substantive standard for reversible

error that is responsive to the imperative for fairness present in all capital murder appeals. It should, I urge, be a rigorous standard that will recognize the need for exacting protection against errors and the utmost protection against constitutional error because a life is in the balance.

For the reasons expressed, I join in the determination of the Court to reverse defendant's conviction and sentence.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GIRIBALDI and STEIN—7.

*For affirmance*—None.